AMERICAN MEAT INSTITUTE,
Plaintiff,

v.

The Honorable Robert S. BERGLAND
et al., Defendants.

Civ. A. No. 78–1642.

United States District Court,
District of Columbia.

Oct. 31, 1978.

---

7.  *See* n. 1, *supra.*

Alan H. Kaplan, Richard S. Morey, Glenn E. Davis, Kleinfeld, Kaplan & Becker, Washington, D. C., for American Meat Institute.

Glenn V. Whitaker, Atty., Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

In this proceeding the American Meat Institute (AMI), requesting declaratory and injunctive relief, seeks judicial review of certain actions taken by the Secretary of Agriculture and other officials[1] of the United States Department of Agriculture (Department or USDA) in the administration of the Federal Meat Inspection Act, 21 U.S.C. § 601, et seq.. In particular, AMI challenges the promulgation and the execution of a recently enacted rule which provides procedures for monitoring the processing of bacon and regulating the presence of nitrosamines in it, 43 Fed.Reg. 32137 (July 25, 1978), 9 C.F.R. § 318.7(b). The matter is before the Court on plaintiff's motions for preliminary injunction and partial summary judgment. The defendants have filed a motion to dismiss which will be treated as a motion for summary judgment inasmuch as it relies upon affidavits and matters outside the pleadings, Rule 12(b) Fed.R.Civ.P. The Court

---

1. The other defendants are the Assistant Secretary of Agriculture for Food and Consumer Services and the Acting Administrator for Food Safety and Quality Service.

has reviewed the extensive record and has had the benefit of counsel's oral argument. For the reasons set forth the Court determines that plaintiff's request for relief should be denied, that summary judgment be entered for the defendants and the complaint dismissed.

### Introduction

Nitrites are chemicals which have been used to process food for centuries. When added to fish, poultry and meat products they react with bacteria and result in a pink or reddish color. More significantly, however, nitrites are added to meat and other products to retard spoilage and to reduce the hazard of botulism, a deadly form of food poisoning. In recent years, however, reliable studies have confirmed that the use of nitrites in cured meats produces nitrosamines, which when consumed by laboratory animals cause cancer.

The Federal Meat Inspection Act requires the Department to condemn all "adulterated" meat products. One of its definitions of adulterated meat is that which "bears or contains any poisonous or deleterious substance which may render it injurious to health," 21 U.S.C. § 601(m). The Department has concluded that cooked bacon containing nitrosamines at confirmable levels is such an adulterated product on the basis of the studies in experimental animals.

The regulation at issue, 9 C.F.R. § 318.-7(b),[2] concerns the use of nitrites in the processing of bacon. The regulation has two subparts. The first, 7(b)(1) requires that 120 parts per million (PPM) sodium nitrite or an equivalent amount of potassium nitrite (148 PPM) and 550 PPM sodium ascorbate or sodium erythorbate (isoascorbate), be used in the preparation of bacon. The second, 7(b)(2), which is the concern of this litigation, sets forth a sampling and analysis procedure for nitrosamine detection in cooked bacon and also specifies retention criteria for bacon found to contain confirmable levels of nitrosamines.

### I.

### *The Background*

In recent years the USDA has devoted increasing attention to the use of nitrites and the presence of nitrosamines in meat products. In 1973, the Secretary of Agriculture appointed an expert panel of scientists from USDA, the Food and Drug Administration (FDA) and private industry to advise on the use of nitrites in meats. Based on data from the expert panel and other sources that nitrites interact with other compounds to form nitrosamines in bacon, the USDA on November 11, 1975, noticed proposed rulemaking to limit the amount of nitrite added to bacon to 125 PPM and to require the use of sodium ascorbate or sodium erythorbate at approximately 550 PPM. 40 Fed.Reg. 52,614, 52,-616. The notice also observed that "a special problem exists with bacon. In this regard, the Department has been assured by the meat industry that it is accelerating studies underway concerning processing procedures . . . directed toward preventing nitrosamine formation in fried bacon." *Id.* In September, 1977, the panel recommended the adoption of a 120 PPM sodium nitrite level in bacon as well as the mandatory use of ascorbate or erythorbate at 550 PPM (120/550).

On October 18, 1977, the USDA, noting the carcinogenic potential of nitrates and nitrites, sought information from the meat industry as to whether their use in bacon production results in the formation of carcinogenic nitrosamines during cooking and preparation for eating. The notice pointed out that the Department was interested in determining whether the use of nitrites in the production of bacon should be banned. 42 Fed.Reg. 55,626.

In addition to earlier submitted information, the American Meat Institute submitted a rulemaking comment entitled "Response for Bacon," March 17, 1978. Attached to and referenced was a cooperative study (Reference 17), conducted in 10 com-

---

**2.** The regulation was published on May 16, 1978, 43 Fed.Reg. 20992 and "clarified" on July 25, 1978, 43 Fed.Reg. 32136.

mercial bacon production plants.[3] The study stated in part that "[i]t was a test of the probable commercial result to be expected upon adoption of the proposed USDA regulations, which call for production of bacon with 125 mg ingoing sodium nitrite and 550 mg of sodium erythorbate or sodium ascorbate . . . ." The cooperative study reported that pork bellies were pumped with determined amounts of nitrite and erythorbate or ascorbate shown for each variable, ranging from 0 PPM to 120 PPM sodium nitrite and 0 to 550 PPM erythorbate or ascorbate. Appropriate production amounts of other curing ingredients were used and the pork bellies were then processed with the normal cook-smoke method of each plant. After the bacon samples were stored for three weeks under refrigeration, they were then tested for nitrosamines by combined gas chromatography (GC) and mass spectrometry (MS). This testing procedure is required under § 318.7(b)(2) and as stated in the study "is widely regarded as the best available technology, and is deemed to be accurate and reproducible at levels at 10 . . . [Parts per billion] or more."

The cooperative study included the following conclusions:

1. None of the samples tested were found to be positive at a level of 10 ppb or more of nitrosopyrrolidine.

2. Lowering the ingoing level of sodium nitrite from 120 ppm to 80 ppm does not appear to reduce the occurrence of very low levels (less then 10 ppb) of nitrosopyrrolidine.

3. Processing variables, such as salt level, cook-smoke cycle, etc. showed no influence on the results obtained.

In the commentary to the "Response for Bacon," the AMI stated at page 3 with respect to the results:

Results of the 10-plant study showed that about 90 percent of the [bacon] samples

were free of nitrosamines, after frying. While tests showed that a few samples did contain nitrosamines, the amounts (10 parts per billion or less) were so small as to raise questions about reliability of the results. Based on this and other information . . ., the USDA Expert Panel endorsed industry's position that bacon be produced with 120 ppm nitrite and 550 ppm ascorbate or isoascorbate.

In addition to the above, AMI submitted other documents and studies establishing that the addition of ascorbates to bacon and levels of 120 PPM sodium nitrite would produce bacon yielding no detectable levels of nitrosamines after cooking.[4] Indeed, prior to March 17, 1978, Richard Lyng, President of AMI, and Dr. John Birdsall, its Scientific Director and Secretary, had recommended to USDA the adoption of the 120/550 PPM levels of nitrite and ascorbate. In October, 1977, Richard Lyng, on behalf of AMI wrote to the Food Safety Quality Service of the Department:

We believe that adequate data have been submitted to demonstrate the effectiveness of reduced nitrite (120 ppm) and increased ascorbate or erythorbate (550 ppm) in producing bacon which when fried contains nonconfirmable quantities of nitrosamines.[5]

Thereafter, on November 3, 1977, President Lyng, again representing the AMI, formally petitioned "the Department of Agriculture to put into effect immediately the amount of nitrite added to bacon to 120 parts per million and to require the addition of 550 parts per million of ascorbate." The petition itself stated in part that such action "would eliminate or reduce significantly the formation of nitrosamines."

II.

*The Regulatory Scheme*

The specific level of exposure to nitrosamines which may cause cancer in humans is

---

**3.** "Response for Bacon" and its attachments is Exhibit B to plaintiff's motion for partial summary judgment of October 10, 1978. Also see affidavit of Sydney J. Butler, Acting Administrator, Food Safety and Quality Service, USDA, filed with defendants' motion to dismiss of September 27, 1978.

**4.** Butler affidavit, ¶¶ 18–23.

**5.** Letter of October 28, 1977, to Dr. Robert Angelotti, Exhibit G to Butler affidavit.

unknown. Furthermore, some persons are more susceptible to cancer induction than others. Rejecting various mathematical models designed to assess potential cancer risks to humans, USDA has made a determination that bacon containing confirmable levels of carcinogenic nitrosamines is adulterated, and should not be made available to the public. Acting on the submissions of the AMI and others the Department concluded, first, that use of the 120/550 PPM levels required by § 318.7(b)(1) will produce bacon which when cooked will not contain nitrosamines at confirmable levels; and second, that repeated findings of nitrosamines at confirmable levels in cooked samples is sufficient evidence of poor quality control and nonadherence to the required levels by a bacon producer, as specified in § 318.7(b)(1).

The challenged section, 7(b)(2), requires sampling and analysis for nitrosamine detection in cooked bacon and specifies retention criteria for bacon found to contain confirmable levels of nitrosamines.[6] A USDA inspector randomly selects a bacon sample from a plant's production lot. The sample is refrigerated 21 days before testing. It is then fried under controlled conditions and later analyzed by a Thermal Energy Analyzer (TEA) to determine evidence of nitrosamines at confirmable levels. If none is found, no further action is taken. If such evidence is found, the inspector collects a confirmation sample from a bacon lot as similar as possible to that from which the earlier sample was taken. This confirmation sample is refrigerated for 21 days, later fried and then tested and analyzed by gas chromatography, mass spectrometry (GC/MS) procedure. Use of this testing methodology was based in part on information submitted by the AMI and on the accumulated knowledge of the Department that the TEA analysis is an inexpensive and accurate method of processing bacon samples for confirmable levels of nitrosamines. From the time that the initial TEA readings are made known, at least 29 days plus shipping time will pass before the GC/MS confirmation results are made final. No bacon will be retained at the plant by the Department prior to GC/MS confirmation that the second bacon sample contains at least 10 PPB nitrosamines. During this interim period, the producer may submit samples for TEA analysis or his own TEA results. If any samples from five consecutive lots contain less than the detection levels of nitrosamines, no further testing will be done and no products retained. However, should the samples continue to yield confirmable levels of nitrosamines by TEA analysis, and if the GC/MS analysis establishes that the confirmation sample contains at least 10 PPB nitrosamines, then all bacon in the plant and all future production will be retained. Subsequent production will not be retained if the producer makes adjustments in the processing and submits samples from five consecutive lots found free of confirmable levels of nitrosamines by TEA testing, which may be done by the producer.

Under this regulation, the retention provisions are not invoked on the basis of a single sample, but only when there is cumulative evidence of a producer's inability to process bacon containing no confirmable levels of nitrosamines when cooked. The USDA bears all testing costs and producers need not purchase testing facilities and equipment or employ additional personnel.

The Department will provide technical advice and assistance to bring producers into compliance with § 318.7(b)(2). Efforts have already been made in this regard. In May, 1978, industry (including AMI), USDA and university personnel organized a task force to develop a basic guide on procedures and problems in bacon processing. Numerous production plants and a cross-section of the industry were visited and examined. The resulting document, "Critical Control Point Processing, Procedures for Pumped Bellies," has been distributed throughout the industry to assist bacon producers in their efforts to comply with § 318.7(b).

6. The precise language of § 318.7(b)(2) was not included in the November 11, 1975 and October 18, 1977 notices.

## III.

### The Legal Considerations

The substance of the plaintiff's charges and the main predicate upon which summary judgment is sought are that in the promulgation of § 318.7(b)(2), meaningful participation was denied, significant procedural errors were committed and the defendants failed to comply with various executive orders. Specifically, AMI asserts that: 1) adequate notice and opportunity for comment were not provided; 2) the statement of "basis and purpose" for the regulation failed to discuss and evaluate the reasons to support the regulation; 3) the Department failed to comply with Executive Orders 11821 and 12044, which require an evaluation of the possible economic effect of the regulation prior to enactment; 4) the Department failed to provide an evaluation of the impact of the regulation as required by the National Environmental Policy Act of 1969.

■ The Administrative Procedure Act requires that an agency publish a notice of proposed rulemaking and an invitation for public comment in promulgating regulations. 5 U.S.C. §§ 553(b) and (c). The rulemaking requirements of § 553 apply only to substantive rules. Such rules relate to and change standards of conduct which have the force of law, *Pacific Gas & Electric Co. v. Federal Power Commission,* 164 U.S.App.D.C. 371, 506 F.2d 33 (1974). Interpretive rules, general statements of policy and rules of agency organization, procedure or practice are exempt. 5 U.S.C. § 553(b)(A). Procedural rules relate to and deal with methods of operation and are not subject to notice and comment. *See Kessler v. Federal Communication Commission,* 117 U.S.App.D.C. 130, 326 F.2d 673 (1963).

■ The Department argues and this Court agrees that § 318.7(b)(2) is procedural in nature and thus exempt from the notice and comment requirement. The section does no more than inform bacon producers and the general public of the procedures which the Department will use to detect and monitor nitrosamines in bacon to secure enforcement of the § 7(b)(1) provisions. No challenge was presented by the plaintiff or others to § 7(b)(1). The Department notes that nitrosamines are known carcinogens and that bacon is considered to be adulterated when it contains confirmable levels of nitrosamines. Nitrosamine formation can be avoided in bacon if nitrite levels are limited to a 120/550 PPM formula. The sampling and testing procedures of § 7(b)(2) are utilized to determine if nitrosamines are present in bacon and to assure that the standards of 7(b)(1) have been followed. The questioned regulation merely permits the USDA to carry out a statutory duty to restrict the consumption of adulterated foods.

■ Furthermore, if the regulations are regarded as substantive in nature, the record supports a finding that the plaintiff was given full and reasonable opportunity to participate in the rulemaking process. This began with the November 11, 1975, USDA notice inviting comment on the proposal to reduce the amount of nitrite added to bacon. It continued with the second notice of October 18, 1977, requesting the meat industry to submit data as to whether the use of nitrates or nitrites in bacon resulted in the formation of nitrosamines in the processing or preparation stage. This time was further extended for 60 days in December, 1977.[7] A number of responses resulted and indeed the plaintiff gave assurances that the industry could produce nitrosamine-free bacon at confirmable levels (less than 10 PPB). In reliance, the Department adopted in subsections 7(b)(1) and (b)(2) the 120/550 PPM levels suggested by the AMI and the testing methodology which plaintiff acknowledged to be the "best available technology."

■ The plaintiff's argument that no notice and comment were provided for § 7(b)(2) is meritless. The data submitted by AMI and considered by the Department are incorporated into that section which is indeed an expression of that data. Furthermore, an agency may promulgate a fi-

7. 42 Fed.Reg. 62,512.

nal rule differing from that originally proposed if the final rule is based upon and is responsive to comments by interested parties. *See International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 428 n. 51, 478 F.2d 615, 632 n. 51 (1973). In *Ethyl Corp. v. Environmental Protection Agency,* 176 U.S.App.D.C. 373, 541 F.2d 1 (1976), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), our Circuit Court rejected a claim that an agency's final regulations were defective because they differed from those earlier proposed and which were the subject of comments. The Court recognized the differences between the proposed and the final regulations but noted that the changes were supported by abundant comments of those affected. The Court found that the plaintiff was not denied an opportunity for comment, stating that "notice need not contain 'every precise proposal which [the agency] may ultimately adopt as a rule'" because "the notice invites comments and the comments will frequently prompt changes in the ultimate regulations." *Id.* 176 U.S.App.D.C. at 420, 541 F.2d at 48. *See also Forester v. Consumer Product Safety Commission,* 182 U.S.App. D.C. 153, 166, 559 F.2d 774, 787 (1977); *American Frozen Food Institute v. Train,* 176 U.S.App.D.C. 105, 132, 539 F.2d 107, 134 (1976).

■ The claim that the statement of "basis and purpose" was deficient is also rejected. There was a full explanation of the evidence and factors considered which led to the sampling, analysis and retention provisions. 43 Fed.Reg. 20992 (May 16, 1978). The grounds for the conclusions reached are clearly stated. The policy aspects of the Department's public health judgment are explained. The Butler affidavit identifies the information relied upon in the testing procedure and explains how and why it was adopted. The AMI responded and commented at every step in the Department's consideration of the problem. The record reflects that there was little, if any, conflict in the responses and comments of interested groups. Nor is this a situation where an

agency attempts to buttress an earlier finding and conclusion by data which are later developed.

■ Little need be said with respect to the executive orders which plaintiff claims are applicable and were ignored in rulemaking. Executive Order 11821 (November 27, 1974) extended to December 31, 1977 by Executive Order 11949 (December 31, 1976) requires that agency regulations be accompanied by a statement evaluating the inflationary impact of the proposal. These two orders expired before § 318.7(b) became effective and are therefore not applicable. Executive Order 12044 (March 23, 1978) requires an analysis and evaluation of the economic and social impact of the regulation. Application of this Order, however, is inappropriate since Section 7 provides:

This Order is intended to improve the quality of Executive Agency regulatory practices. *It is not intended to create delay in the process or provide new grounds for judicial review.* [Emphasis added.]

14 Weekly Comp. of Pres.Doc. 561 (Mar. 23, 1978).

In any event, the fact is that "an impact analysis" was prepared by the Department [8] which discussed the anticipated cost impact on industry, the consumer and the Department. Based on the AMI's submissions the analysis concluded that the industry would not be exposed to substantial additional costs. Indeed, as also viewed by this Court, the various affidavits submitted by the plaintiff claiming additional cost impact and harm are doubtful and speculative. According to the plaintiff's own data, industry will comply with § 318.7(b) in most instances, and there will be no massive retention program or shut-downs of large segments of the industry.[9]

■ Likewise lacking in merit is the contention that NEPA requirements were not met. For NEPA to apply there must be a "major Federal action . . . signifi-

---

8. 43 Fed.Reg. 20995 (May 16, 1978), reports that such an analysis was available from Food Safety and Quality Service.

9. Butler affidavit, ¶ 27.

cantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). But plaintiff's rulemaking submissions clearly demonstrate that the sampling and analysis procedures have little of the effect contemplated by NEPA on industry or the public and that bacon can be produced in a commercially feasible manner containing less than 10 PPB nitrosamines when cooked.

■ In reviewing the Department's action, this Court must determine whether the choice made by Agriculture officials was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. This standard is highly deferential, presumes the agency action to be valid, and does not allow the Court to substitute its judgment for that of the agency. In applying the arbitrary and capricious standard, the Court must consider whether the decision was based on a consideration of all relevant factors and has a rational basis in the evidence. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Ethyl Corp.*, 176 U.S.App.D.C. at 406, 541 F.2d at 34.

From all that has been presented in this proceeding one cannot conclude that the Department misconstrued plaintiff's rulemaking comment which supported the 120/550 PPM level. The plaintiff's rulemaking submissions and the Department's accumulated expertise afford adequate support for the sampling, analysis and retention provisions of § 7(b)(2). There is no evidence contradicting the data submitted by the plaintiff. The sampling and testing procedures included in that section track those used by the AMI in its 10-Plant Study.

■ The underlying premise under which the Department acted, namely, that bacon containing confirmable levels of nitrosamines when cooked is adulterated, is a proper public health judgment in view of the Department's policy of reducing human exposure to carcinogens as much as possible. And where an agency's decision rests in large part on technical and scientific data and is in an area in which discretion has been delegated to it by Congress, such judgments should be respected.

While the Department's decision may be based upon disputed evidence, the decision cannot be considered irrational. This is particularly true in view of the AMI's representation that bacon can be commercially produced without confirmable levels of nitrosamines. Moreover, the courts have sustained public health judgments made in the face of disputed facts. *Ethyl Corp.*, 176 U.S.App.D.C. at 400, 541 F.2d at 28; *Industrial Union Department, AFL–CIO v. Hodgson*, 162 U.S.App.D.C. 331, 339, 499 F.2d 467, 475 (1974). Although the plaintiff is free to speculate on dose exposure levels of nitrosamines, the defendants have a higher duty to protect the public from the risks of cancer. The Department of Agriculture should not gamble when it is clear that nitrosamines are carcinogenic. The defendants' decision was necessarily based "in part on 'factual issues,' but largely 'on choices of policy, on an assessment of risks, [and] on predictions dealing with matters on the frontiers of scientific knowledge . . . .'" *Ethyl Corp.*, 176 U.S.App.D.C. at 401, 541 F.2d at 29.

### Conclusion

■ The retention of the producer's bacon as provided in the challenged regulation is necessary to insure better quality control and adherence to the nitrite and ascorbate levels of § 7(b)(1). There is no dispute about those levels. The Department has a clear mandate under the Federal Meat Inspection Act to protect the public from adulterated foods. A clear duty is also imposed on USDA meat inspectors by regulation, 9 C.F.R. § 318.2(d).[10] Multiple find-

---

**10.** 9 C.F.R. § 318.2(d), enacted in 1970, provides in part that USDA meat inspectors tag for retention and further inspection all suspected adulterated or misbranded products. The products are also subject to condemnation. 35 Fed.Reg. 15,587 (Oct. 3, 1970); 36 Fed.Reg. 11903 (June 23, 1971).

ings of confirmable levels of nitrosamines provide sufficient evidence that the producer's bacon is adulterated.

The uncontroverted evidence shows that nitrosamines are potent carcinogens, that dose level exposures are inconclusive, and that certain people are more susceptible to cancer induction than others. The fact that nitrosamines in cooked bacon may cause cancer in humans is sufficient for the defendant to declare "adulterated" bacon with confirmable nitrosamine levels. Based on what the Court has reviewed, a decision not to eliminate nitrosamines at confirmable levels might be considered arbitrary and capricious.

The plaintiff has failed to establish the prerequisites for the issuance of preliminary injunctive relief, including likelihood of success on the merits of its claim and irreparable harm. *Washington Metropolitan Area Transit Comm'n. v. Holiday Tours,* 182 U.S.App.D.C. 220, 559 F.2d 841 (1977); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm.,* 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958).

Accordingly, plaintiff's motions for preliminary injunction and for partial summary judgment are denied. The defendants' motion to dismiss is granted and summary judgment will be entered in favor of the defendants.