**STATE BOARD OF INSURANCE of Texas, et al., Appellants,**

v.

**William DEFFEBACH, Appellee.**

**No. 13409.**

Court of Appeals of Texas, Austin.

March 31, 1982.

Rehearing Denied May 5, 1982.

Mark White, Atty. Gen., Nancy O. Ricketts, Asst. Atty. Gen., Austin, for appellants.

Forrest C. Roan, Warren G. Craig, Jr., Roan & Gullahorn, P. C., Shannon H. Ratliff, McGinnis, Lochridge & Kilgore, Austin, for appellee.

SHANNON, Justice.

Appellee William Deffebach filed a declaratory judgment suit in the district court of Travis County pursuant to the Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat.Ann. art. 6252–13a § 12 (Supp.1981). The objective of that suit was to obtain a declaration that Order No. 37,-495, promulgated by the State Board of Insurance and containing certain rules pertaining to credit life and health and accident insurance, was invalid. After hearing, the district court rendered judgment declaring the order invalid in part and enjoining the agency from enforcing it. This Court will reverse the judgment and dissolve the injunction.

The findings of fact filed by the court established the following:[1] The Board published notice of certain proposed credit insurance rules to be considered for adoption and sent letters of notice and copies of the proposed rules to one hundred seventy-six insurers and to other interested persons who had requested notice. Deffebach is an agent appointed by an insurance company to sell credit life and health and accident insurance. The Board's order promulgating presumptive rates "basically reduced the amount of premium paid for credit insurance" with a resultant reduction of Deffebach's income from commissions.

The district court concluded that the Board's order establishing presumptively reasonable premium and benefit packages constituted ratemaking, and as such, should have been considered in a contested case proceeding rather than in a rulemaking context under the Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat. Ann. art. 6252–13a (Supp.1981) [sometimes referred to as APTRA]. The court also declared the order exceeded the statutory authority of the Board inasmuch as it regulates insurance commissions, and that the adopted rules differed materially and substantially from those published as proposed rules therefore mandating republication as proposed rules.

## STANDING TO SUE

The Board attacks the judgment by several points of error, some of which assert the district court erred in concluding Deffebach had standing to file a declaratory judgment action pursuant to art. 6252–13a § 12 (Supp.1982). We will overrule those points of error.

Section 12 provides as follows:

The validity or applicability of any rule, including an emergency rule, adopted under Section 5(d) of this Act, may be determined in an action for declaratory judgment in a district court of Travis County, and not elsewhere, if it is alleged that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff. The agency must be made a party to the action. A declaratory judgment may be rendered

---

1. The district court failed to file findings of fact and conclusions of law even though the Board fully complied with the requirements of Tex.R. Civ.P. 297. In response to an order of this Court pursuant to Rule 434, the district court filed its findings and conclusions on November 25, 1981. Thereafter, as allowed by this Court, the parties filed supplemental briefs based on the district court's findings and conclusions.

whether the plaintiff has requested the agency to pass on the validity or applicability of the rule in question. However, no proceeding brought under this section may be used to delay or stay a hearing after notice of hearing has been given if a suspension, revocation, or cancellation of a license by an agency is at issue before the agency.

If one shows an affirmative act by the agency to apply its rule to him and that the application of such rule would adversely affect his legal rights or privileges, he has standing to challenge the applicability of the rule in a § 12 declaratory judgment suit. Shannon & Ewbank, *The Texas Administrative Procedure and Texas Register Act Since 1976—Selected Problems*, 33 Baylor L.Rev. 393, 422 (1981). Under § 12, one is not required to wait until the rule is attempted to be enforced against him before he may resort to declaratory relief.

Deffebach pleaded that the rules promulgated by the Board's order would result in a diminution "of compensation and commissions due him" as a licensed credit life and accident and health insurance agent. The proof was that the operation of the rules in question would place a ceiling, in effect, on commissions from credit life insurance, and would reduce substantially Deffebach's income from commissions. Since the imposition of the rules would clearly "affect" Deffebach, the Board's points of error attacking Deffebach's standing are overruled.

## STATUTORY AUTHORITY TO PROMULGATE PRESUMPTIVE RATES

The parties treat the district court's judgment as having declared the Board was without authority to enter the order establishing presumptive rates for credit life and health and accident insurance. Although the "preliminary statement" in the district court's findings is that it did not rule on the authority of the Board to enter the order, the district court's judgment obviously provides that the Board, by entering the order, "... acted beyond the statutory authority

delegated to it ... by regulating and controlling agent commissions...." The judgment further orders that the Board "... be permanently enjoined from enforcing, implementing or administering [the order]...." It would seem the district court prohibited the Board from exceeding its statutory authority, but refused to set out by declaratory judgment the scope of the Board's authority with respect to credit insurance premium rates.

Under the circumstances, this Court views the judgment as having determined the Board was not empowered to establish presumptive rates for credit life and health and accident insurance. By several points of error, the Board argues it was authorized to enter the order promulgating the rules.

A preliminary word concerning credit life and health and accident insurance may be of benefit to an understanding of this part of the appeal. Credit insurance is designed to assure repayment of a debt in the event of the debtor's death or disability. The debtor usually purchases such insurance through the creditor at the time the loan or other credit transaction is made. The debtor normally pays a single premium directly or indirectly for the full term coverage. In most cases, a creditor requires credit insurance for the loan. He makes credit insurance available to the debtor to meet that requirement and is the beneficiary of the policy. The creditor usually selects the insurer and receives some form of compensation for sale of the coverage.

We understand the creditor's control over the market for credit insurance and selection of the insurer encourages competition between insurers for the business upon the basis of the quality of service afforded by the insurer to the creditor and the amount of compensation paid creditors rather than upon the basis of the lowest premium charged debtors. The single premium nature of the business generates a large initial cashflow which permits payment of substantial "front end" compensation to creditors which, on occasion, results in the remaining premium being insufficient for the insurer to meet its ultimate obligations to

the debtor-policyholders over the full term of coverage.

In 1963, the legislature amended Tex.Ins. Code Ann. art. 3.53, which regulates credit life and accident and health insurance. Article 3.53 is derived from the "Model Act" drafted by the National Association of Insurance Commissioners. Sections 7, 8, and 12 of art. 3.53, as relevant to this appeal, vest the Board and the Commissioner of Insurance with certain specific authority.[2]

■ Deffebach insists that the Board has no authority "to set rates for credit life and credit accident and health insurance." In this connection, Deffebach argues, correctly, an agency can adopt only such rules as are authorized by and consistent with its statutory authority. *Kelly v. Industrial Accident Board*, 358 S.W.2d 874 (Tex.Civ.App. 1962, writ ref'd). In determining whether an agency has exceeded its rulemaking authority, the critical factor to be considered is whether the rule harmonizes with the general objectives of the statute. *Gerst v. Oak Cliff Savings & Loan Association*, 432 S.W.2d 702 (Tex.1968); *Jefco, Inc. v. Lewis*, 520 S.W.2d 915 (Tex.Civ.App.1975, writ ref'd n. r. e.).

■ An examination of those sections of art. 3.53 set out in the margin makes clear that the Board has not been vested with the specific power to set rates for credit insurance. Instead, it has authority to approve forms and the ratio of premiums to benefits accorded by coverage. A credit insurer can write only those policies which have been filed with and approved by the Commissioner. Before approving the policy form, the Commissioner is required to review the policy benefits and the filed schedules of premium rates and to make a determination of the reasonableness of the relationship of benefits to rates and rates to benefits. The Commissioner must consider both the rates and the benefits in order to exercise the authority required of him by art. 3.53.

Section 12 of art. 3.53 empowers the Board to formulate rules and regulations appropriate for the supervision of the Act. Among the several rules promulgated by the Board and contained in the order under consideration is Rule 05.001. Rule 05.001 permits the Commissioner to presume, sub-

2. Sec. 7 provides:

A. All policies, certificates of insurance, notices of proposed insurance, applications for insurance, endorsements and riders delivered or issued for delivery in this State and the schedules of premium rates pertaining thereto shall be filed with the Commissioner.

B. The Commissioner shall within sixty (60) days after the filing of any such policies, certificates of insurance, notices of proposed insurance, applications for insurance, endorsements and riders, disapprove any such form if the benefits provided therein are not reasonable in relation to the premium charge, or if it contains provisions which are unjust, unfair, inequitable, misleading, deceptive or encourage misrepresentation of the coverage, or are contrary to any provision of the Insurance Code or of any rule or regulation promulgated hereunder.

C. If the Commissioner notifies the insurer that the form is disapproved, it is unlawful thereafter for such insurer to issue or use such form. In such notice, the Commissioner shall specify the reason for his disapproval and state that a hearing will be granted within twenty (20) days after request in writing by the insurer. No such policy, certificate of insurance, notice of proposed insurance, nor any application, endorsement or rider, shall be issued or used until the expiration of sixty (60) days after it has been so filed, unless the Commissioner shall give his prior written approval thereto.

D. The Commissioner may, at any time after a hearing held not less than twenty (20) days after written notice to the insurer, withdraw his approval of any such form on any ground set forth in Subsection B above. The written notice of such hearing shall state the reason for the proposed withdrawal.

E. It shall not be lawful for the insurer to issue such forms or use them after the effective date of such withdrawal.

Sec. 8 provides in part:

A. (1) Any insurer may revise its schedules of premium rates from time to time, and shall file such revised schedules with the Commissioner. No insurer shall issue any credit life insurance policy or credit accident and health insurance policy for which the premium rate exceeds that determined by the schedules of such insurer as then on file with the Commissioner.

Sec. 12 provides in part:

The State Board of Insurance may, after notice and hearing, issue such rules and regulations as it deems appropriate for the supervision of the Act.

ject to rebuttal, that the benefits of a credit life and health and accident form are reasonable in relation to the premium charged if the premium rate schedule for such benefit, as filed with the Commissioner, does not exceed a certain rate. Other rules presently under attack provide insurers the right to rebut the presumptive rate and to make independent filings, should they choose. Acceptance of the presumptive rates and benefits is optional, at least in theory.

In addition, the Commissioner under the rules may deny or revoke the presumed acceptable filings should the benefits and the premium rates in a given case prove unreasonable. We do not understand the rules to fix or mandate the use of any specific rate or policy form.

This Court is of the opinion that the Board's rules are harmonious with the general objective of art. 3.53. *Gerst v. Oak Cliff Savings & Loan Association, supra.* The Court has concluded further that the Board's authority to promulgate the rules is necessarily implied from the duties and obligations imposed by art. 3.53.[3]

### RULEMAKING OR CONTESTED CASE PROCEEDING

The Board assails the district court's conclusion that the Board erroneously conducted the credit insurance hearing as a rulemaking proceeding rather than as *ad hoc* adjudication. Significant procedural and substantive consequences flow from an agency's determination to proceed in a particular matter in a general rulemaking hearing or by *ad hoc* adjudication. The character of rulemaking procedures[4] is different, of course, from those adopted in adjudication of contested cases.[5] The type of notice, the form of the hearing, the record,[6] the mechanics of decision,[7] and review[8] differ. 1 F. Cooper, *State Administrative Law* 177, 178 (1965).

In cases wherein it appears many persons will be affected in substantially the same manner by administrative action, there are advantages in the agency's utilization of rulemaking procedures. Conversely, where a single party or only a small, well-defined group will be affected by the administrative order, the adoption of rulemaking procedures may cause hardships to the parties involved. 1 F. Cooper, *State Administrative Law* 179 (1965). Unless mandated by statute, the choice by an agency to proceed by general rule or by *ad hoc* adjudication is one that lies primarily in the informed discretion of the agency. *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). Professor Cooper suggests that where an agency faces the alternative of proceeding by rulemaking or by adjudication, the process of rulemaking should be utilized except in those cases where there is a danger that its use would frustrate the effective accomplishment of the agency's functions. 1 F. Cooper, *supra*, at 181.

Deffebach insists the Board, in this instance, had no choice between an adjudicative process and a rulemaking hearing. This is so, Deffebach argues, since a "contested case" is defined by § 3(2) of art. 6252–13a as one "including but not restricted to ratemaking and licensing." This Court does not agree. In preceding discussion, this Court stated its conclusion that Tex.Ins.Code § 3.53 vests the Board with no authority to set rates for credit insurance. Nevertheless, as stated previously, we do not understand the rules promulgated by the Board to "make rates" for credit insurers. Accordingly, the Board was not required by § 3(2) of art. 6252–13a to conduct the credit insurance hearing as a contested case.

---

**3.** It is of interest that since submission and oral argument in this appeal, the legislature amended art. 3.53 to expressly recognize the Board's authority to establish presumptive rates. 1981 Tex.Gen.Laws, ch. 493, § 7 subsection F(ii), at 2110.

**4.** Tex.Rev.Civ.Stat.Ann. art. 6252–13a § 5.

**5.** *Id.*, § 13.

**6.** *Id.*, § 13(f).

**7.** *Id.*, § 16.

**8.** *Id.*, § 19.

Other considerations suggest that the Board properly conducted the matter as a rulemaking hearing. A "rule" is defined by § 3(7) of art. 6252–13a as "an agency statement of general applicability that implements, interprets, or prescribes law or policy. . . ." The Board's effort was to implement the policy set out in Tex.Ins.Code § 3.53. Such Board action would necessarily affect all credit insurers. Certain and prospective application of the Board's implementation of § 3.53 is more advantageous to all concerned than would have been a Board determination in a contested case involving a single credit insurer. In the rulemaking process, as in the present case, all interested companies and persons are able to participate and by comment help shape Board policy.

## PUBLICATION

The Board complains further that the district court erred in declaring the rules adopted by the Board differed substantially from the proposed rules and therefore should have been republished prior to adoption. The proposed rules were originally published on December 25, 1979, in accordance with § 5 of the APTRA. After receiving comment at a public hearing in February, 1980, the proposed rules were again published on February 29, 1980, with some changes. After a second hearing, the proposed rules were again modified but no further publication as proposed rules was ordered. Rather, they were published as adopted rules on July 11, 1980.

Section 5(a) requires that an agency publish proposed rules at least 30 days before its intended action. Notice is effective when published. § 5(b). The agency must allow interested persons an opportunity to submit data, views, or arguments prior to adoption of the rules. A hearing must be held if twenty-five or more persons request one. § 5(c). No rule is valid unless adopted in substantial compliance with § 5.

A § 5(a) notice requires the following:
1) a brief explanation of the proposed rule;
2) the text of the proposed rule . . . ;
3) a statement of the statutory or other authority under which the rule is proposed . . . ;
4) a fiscal note stating the fiscal implications . . . ;
5) a request for comments . . . ; and
6) any other statement required by law.

The basic purposes of the notice requirements of § 5 are to inform the public of the contents of the proposed rule and to give persons sufficient advance notice of the rule's content to permit them to ascertain whether protection of their interests requires them to request a hearing and participate therein. Shannon & Ewbank, *supra*, 430–31. In addition, the notice and publication requirements are beneficial in that they promote public participation in the rulemaking process. Public participation tends to assure that the agency will have access to diverse facts and divergent views concerning the subject before it establishes rules and procedures that will have a substantial impact on those regulated. Further, it is said that public participation tends to assure that the agency will accord fair and mature consideration to the proposed rules. *See* Annot., 45 A.L.R.Fed. 12, 24–27 (1979).

The district court concluded several rules as adopted in the Board's order were materially different from those originally proposed and could only be adopted validly after the same had been republished as proposed rules pursuant to § 5.

■ An examination of § 5 reveals nothing which specifically requires publication of a proposed rule more than once. Moreover, only substantial compliance with the section is required by § 5(e). By reading § 5 restrictively, it might be concluded that once a proposed rule has been published, no other notice is required, even though "substantial changes" had been made in the rule in response to information obtained at the hearing.

In other jurisdictions, the rule has evolved that an agency may promulgate a rule which differs from that originally proposed, provided the final rule is based upon

and is in response to comments and information obtained at the hearing. *BASF Wyandotte Corp. v. Costle*, 598 F.2d 637 (1st Cir. 1979) (sustaining interim discharge regulations of pesticide industry); *Forester v. Consumer Product Safety Commission*, 559 F.2d 774 (D.C.Cir.1977) (upholding bicycle manufacturer regulations); *South Terminal Corp. v. EPA*, 504 F.2d 646, 656 (1st Cir. 1974) (validating regulations designed to reduce automobile use); *American Meat Institute v. Bergland*, 459 F.Supp. 1308, 1314 (D.D.C.1978) (sustaining rules mandating monitoring process of bacon for nitrosamines); *Ala Moana Boat Owner's Association v. State*, 50 Hawaii 156, 434 P.2d 516, 519 (1967) (upholding small-boat-harbor regulations). *See also, International Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 632 n. 51 (D.C.Cir.1973) (dealing with auto-emission standards).

Most would agree that § 5(a) should not be construed to impose upon the agency the Sisyphean task [9] of automatically affording a new opportunity for comment simply because the rule, as promulgated by the agency, differs from the rule the agency proposed when the differences resulted from public comments at the hearing. *See International Harvester Co. v. Ruckelshaus, su-*

*pra.* Neither should the agency be permitted to ignore the proposed rules and espouse other rules without further comment.

After proper notice and hearing, should the agency incorporate public comments into the proposed rule and should such rule affect no other subject or person than those previously given notice, it would seem to this Court no further purpose would be served by requiring republication of the proposed rules. Conversely, should the proposed rules, as originally published, be ignored and others adopted or should other subjects or persons be affected by the altered rule, a new round of notice and comment should be required.

From time to time, republication problems more complex than those involved in this appeal will arise. Such cases may require elaboration or refinement of the rules concerning republication. In the present appeal, however, the above statement is considered sufficient.

In the margin we have examined the proposed rules and the rules as finally promulgated in an effort to ascertain whether the changes resulting from comment affected different subjects of regulation or affected new parties.[10]

---

**9.** In Hades, Sisyphus was condemned to roll to the top of a hill a huge stone which constantly rolled back again, making his task incessant.

> Then I witnessed the tortures of Sisyphus, as he tackled his huge rock with both hands. Leaning against it with his arms and thrusting with his legs, he would contrive to push the boulder up-hill to the top. But every time, as he was going to send it toppling over the crest, its sheer weight turned it back, and the misbegotten rock came bounding down again to level ground. So once more he had to wrestle with the thing and push it up, while the sweat poured from his limbs and the dust rose high above his head. Homer, *The Odyssey*, Book XI (Penguin Classics, 1956) at 187.

**10.** Rule .02 dealing with applications and policies was changed somewhat from its proposed form. Diction and punctuation were slightly modified, as was the beneficiary designation. Section 9 was reworded and moved to section .02.004 intact, absent the check record requirement. In § .02.005, a reference to Article 3.35 was inserted in § E. These changes appear to be minimal and do not subject new

parties to regulation nor do they impose new subjects of regulation.

Rule .03 regarding forms and rates approval, was changed somewhat from its proposed form. Diction and punctuation were changed. Section .03.001 was modified so that insurers could use existing forms marked "3.53." Perhaps some significant changes were made in .03.002. There, loss ratios were changed "to achieve uniformity." In the proposed rule, single credit life loss ratio was set at 50% while joint credit life was set at 66 and $\frac{2}{3}$%. The final rule set both at 50%. For credit accident and health, six subcategories existed in the proposed rule, varying from 52%–63%. The final rules set a uniform 60%. Also, a minimum $5.00 charge for small accounts was ordered to make them more economically justifiable. Lastly, an alternate definition of "earned premium" was added. The purpose of the last change was "uniformity" and was suggested by public comment at the hearing and by the advisory committee. The district court made no declaration with respect to Rule .04.

Rule .05 regarding presumptive premium rates, showed a change *from* lower proposed rates back to the then existing rates, that is, no

Fifteen rules were originally proposed: 059.53.01 through 059.53.14 and 059.-53.20. Two current rules were proposed to be repealed: 059.03.53.001 and .002. The purpose of the proposed rules was to establish presumptively reasonable premium rates for all life and health and accident insurance policies sold. A capacity crowd attended the hearing and the record spans almost nine hundred pages. It is fair to say public comment was extensive.

This Court has concluded that the changes in the rules as finally promulgated regulated no new parties and affected no new subjects of regulation. The changes were in almost every instance the result of public comment. The parties were given two periods of comment rather than one before publication of the adopted rules. The express mandate of APTRA was followed and its underlying rationale has been observed.

The judgment of the district court is reversed and the injunction dissolved. Judgment is here rendered that Deffebach has standing to file the declaratory judgment suit pursuant to APTRA § 12; that the Board has authority to promulgate presumptive rates; that the Board properly conducted the proceeding as a rulemaking hearing; and the rules as finally adopted are not required to be republished.

---

change in existing regulation at the time of original publication. The source of this change was public comment. This rule was also amended to recognize the use of computers. Lastly, § .06.001(3) was moved to this rule. Rule .06 concerning standards of benefits, experienced minor dictation changes and § .06.-001(3) was moved to Rule 5. Section 06.001.3 was changed to delete six-months coverage for pre-existing injuries, a change which appears to favor insurers. Provision .06.001(3)(B)(vi) was added. It provides that an insurer cannot use material misrepresentation as a defense against payment of a claim unless the insurer required the insured to sign a written statement in which the alleged misrepresentation was made.

Rule .07 which concerns deviation requests was "substantially rewritten." Section .07.003 was moved to .010 and .07. Section .007 was moved to .003. The avowed effect and reason for the change was to make the deviation process simpler. The source of the change was public comment.

Rule .08 concerns statistical data to be kept by insurers. The form was retained and a new section was added, giving "actual notice" of specific data to be kept. The proposed rule merely stated generally what was to be kept. The source of the change was public comment.

Rule .09 was unchanged.

Rule .10 regards payment of refunds to policyholders if their coverage is terminated pre-maturity. Portions were changed for "clarification." Section .10.002 was rewritten to highlight the fact that insurers had the responsibility to see that creditors properly refunded premiums. The change had no effect on the regulation of credit insurance.

Rule .11 deals with obligations between insurers and agents. It was amended to recognize the use of computers.

Section 11.009 was omitted because it was considered to be included in .10. Section .010 was renumbered to .009 and reworded for clarification. A new section .010 was added. It merely states the existing law of Tex.Ins.Code § 1.15. The source of these changes was again public comment.

Rule .12, regarding policy and claims reserves, added a different acceptable mortality table. A provision giving the insurer the choice of adopting the "Rule of Anticipation" or the "Rule of 78's" was added. The source of the changes was public comment and the effect seems to be less restriction on insurers.

Rule .13 was unchanged.

Rule .14 had as its purpose setting presumptive commission rates for insurers using presumptive premium rates. Minor clarification changes were made. A section was added giving the agent the responsibility to be certified. A section allowing for rates other than presumptive commission rates was also added to diffuse allegations of commission setting.