Julio **QUIÑONES LOPEZ**, et al., Plaintiffs,

v.

**COCO LAGOON DEVELOPMENT CORP., et al., Defendants.**

Civ. No. 80–2533(TR).

United States District Court, D. Puerto Rico.

March 29, 1983.

Carlos Vizcarrondo Irizarry, Legal Services of Puerto Rico, Canóvanas, P.R., for plaintiffs.

Steven C. Lausell, Jiménez & Fusté, San Juan, P.R., for defendants.

## OPINION AND ORDER

TORRUELLA, Chief Judge.

This action concerns the review of the issuance of Permit No. 80J–5015 to Coco Lagoon Development Corporation (Coco Lagoon) by the Army Corps of Engineers (Corps).[1] Originally plaintiffs sought, in addition to the revocation of Permit No. 80J–5015, the denial of Permit Application No. 80J–5041 and the revocation of Permit No. 67–574.[2] All claims related to Permit No. 67–574 and Permit Application· No. 80J–5041 were dismissed pursuant to our

---

1. In addition to the Corps and Coco Lagoon also defendants are Coco Beach Lagoon Estates, Inc. and Arturo Diaz, its president. These, together with Coco Lagoon Development Corporation, will be referred to collectively as "Coco Lagoon."

2. The Corps issued said permits pursuant to Section 404 of the Federal Water Pollution Control Act, 33 U.S.C. § 1344, which regulates the discharge of dredged or fill material into the navigable waters of the United States.

Orders of September 20, 1982 and November 3, 1982, respectively.[3]

Plaintiffs contend that Permit No. 80J–5015 is not valid inasmuch as the Corps did not comply with the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S. § 4332, and the Corps own regulations. 33 C.F.R. § 320 *et seq.* (1979).

■ NEPA establishes a national policy that requires all Federal agencies to consider, to the fullest extent possible, the environmental effect of its actions. In order to further its purpose NEPA requires from all Federal agencies to:

"(C) include in every recommendation or report on proposals for Legislation and other major Federal actions significantly affecting the quality of the environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes." (42 U.S.C. § 4332(a), (c)).

Putting NEPA's requirements in the inverse, if the action is not a major Federal action or it does not affect significantly the quality of the human environment, then an Environmental Impact Statement (EIS) will not be required, but some kind of assessment will usually be a prerequisite to such a conclusion, pursuant to each Federal agency's rules. *e.g.* 40 C.F.R. § 1508.9 (1979).

In the case at bar the Corps prepared an Environmental Assessment (EA) on Permit No. 80J–5015 and concurrently, a Finding of No Significant Impact (FONSI). These documents concluded that an EIS was not necessary. Plaintiffs find fault with those findings and request that we review the wisdom of said decisions.

■ The duties placed on the Federal agencies by NEPA are essentially procedural. *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). Thus, the scope of judicial review of an administrative decision to the effect that the environmental impact of an agency action is not so significant as to warrant an EIS is limited in scope. The courts must inquire into whether the established procedure was followed and whether the agency's decision is arbitrary and capricious. See *Aertsen v. Landrieu,* 637 F.2d 12, 19 (1st Cir.1980), *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir. 1980), *Barceló v. Brown,* 478 F.Supp. 646, 703–705 (D.P.R.1979).

In other words the court must assure itself that the agency has given good faith consideration to the environmental consequences of the proposed action. *Com. of Puerto Rico v. Muskie,* 507 F.Supp. 1035, 1052–1053 (D.P.R.), vacated on other grounds, 668 F.2d 611 (1st Cir.1981). This standard is highly deferential to agency ac-

---

**3.** In accordance with our Order of September 20, 1982 other claims related to Permit No. 80J–5015 were dismissed as well.

tion, presumes its regularity, and proscribes the substitution of judicial opinion for that of the agency if a convincing basis for the agency's decision is shown. *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 282 (D.C.Cir.1981). Therefore, the reviewing Court's task is to turn to the administrative record to determine whether the same contains convincing evidence to sustain the agency's decision not to file an EIS. When looking at the record, the Court should not pass judgment on the balance struck by the agency among competing concerns. *Maryland National Capital Park & Planning Comm'n v. U.S. Postal Service,* 487 F.2d 1029, 1040 (D.C.Cir.1973).

Before considering the merits of Plaintiffs' contentions a brief recapitulation of this case's background is helpful.

In 1967, pursuant to Permit No. 67–574, a subsidiary of Coco Lagoon dredged about 3 million cubic yards of sand material from Comezón Cove, in Rio Grande, Puerto Rico, thus filling around 200 acres of mangroves in and south of Punta Miquillo nearby, which resulted in the destruction of a mangrove forest.[4] No further work was performed in this filled area from 1969 to 1977 and it evolved into secondary marine wetland. Meanwhile that location was used as a spoil disposal site. In 1977, without the appropriate permits, Coco Lagoon renewed filling operations in the previously filled mangrove wetland area. These illegal activities were brought to the Corps' attention who then inspected the affected area. It found that a drainage canal had been blocked by fill, and that fill was deposited in a white mangrove forest to build a sewage treatment plant and in an area where the secondary marine wetland had evolved.

As a result of those findings the Corps first sent Coco Lagoon a warning letter in October 1979. Due to Coco Lagoon's inaction the Corps issued a Cease and Desist Order in January 1980. This order resulted in all further work being stopped to allow the Corps to evaluate the impact of the activity. To those effects the Corps requested comments from various Federal and State agencies. At this point Coco Lagoon requested an after-the-fact permit. Meanwhile the Corps received comments from the Environmental Quality Board of the Commonwealth of Puerto Rico (EQB), the Department of Natural Resources (DNR), the U.S. Environmental Protection Agency (EPA), the Fish and Wildlife Service of the U.S. Department of Interior (FWS), and the National Marine Fisheries Service of the U.S. Department of Commerce (NMFS). Coco Lagoon also made a submission through Dr. Maximo Cereme-Vivas. The general consensus, with the only exception being the NMFS report, was that the filled secondary wetland was of marginal ecological value.[5] As a result, it was recommended that an after-the-fact permit be granted, but not before Coco Lagoon undertook certain corrective measures. The corrective measures consisted of relocating the sewage treatment plant, the restoration of the affected white mangrove and the removal of the fill deposited in the drainage canal. The Corps further required that a wetland mangrove forest, of about 20 percent of the size of the area to be developed, be created. Coco Lagoon agreed and it planted 26 acres with white and red mangroves.

On April, 1980 the Corps issued a Public Notice concerning Permit Application No. 80J–5015. The notice set May 9, 1980 as the deadline for the consideration of any comments. Only the FSW replied to the notice. On May 12, 1980 the Corps filed an Environmental Assessment and Findings of Fact on Permit Application No. 80J–5015. In said document the Corps concluded that an EIS was not required inasmuch as the net environmental impact of the activity

---

4. The issue whether the area filled and the amount of sand dredged were within the authority granted by Permit No. 67–574 is not before us. See our Order of November 3, 1982.

5. During the course of the investigation an officer of the NMFS stated that in a scale of 1:5, red mangroves being the most productive systems, and 0 being a totally unproductive area, that he would categorize the area as generally having a productivity value of 1.

was positive. Thus the Corps concluded that the issuance of the permit would not significantly affect the quality of the human environment and granted Coco Lagoon the filling permit.

Turning to the issues at hand, we find that the administrative records contain convincing evidence to sustain the Corps decision not to file an EIS. It clearly demonstrates that the Corps considered the environmental impact that could result on the surrounding environment from the deposit of fill on the 140 acres of secondary wetlands.[6] The field investigations conducted by the Corps in the wetlands in issue gave it an opportunity to physically inspect the extent of the fill operations and the state of the wetlands. The comments submitted by the concerned Federal and State agencies confirm the Corps observations, namely, the location of the sewage treatment plant and the marginal value of the wetlands. The close cooperation among these concerned agencies allowed that corrective and mitigative measures be taken. This in turn led to positive environmental results due to, what was in the Corps opinion, the high productive nature of the newly created wetlands. On such a subject matter we owe great deference to the agency's administrative expertise, specially when its decision rests, in large part, on technical experience and observation and is within an area of discretion delegated to the Corps by Congress. *American Meat Institute v. Bergland,* 459 F.Supp. 1308 (D.C.D.1978).

The second step into our inquiry on the Corps compliance with NEPA is whether the Corps has followed the established procedure. See *Grazing Fields Farm v. Goldschmidt,* supra. Plaintiffs contend that the Public Notice pertaining to Permit No. 80J–5015 was misleading and that no public hearings were held. Additionally Plaintiffs indirectly claim the insufficiency of the FONSI as a procedural irregularity. Lastly, Plaintiffs also contend that the Corps failure to obtain a state coastal zone certification as required by the Coastal Zones Management Act, 16 U.S.C. § 1451 *et seq.,* (CZMA), is sufficient cause to reverse the issuing of Permit No. 80J–5015. We do not find any procedural violations which require invalidating the Corps decision to grant Permit No. 80J–5015.

The public notice as first issued on April 21, 1980, and complemented on April 22, 1980, fully complies with the regulations adopted for those purposes by the Corps.[7]

---

**6.** The Corps had to consider the impact the deposit of fill on the 140 acres would have on the surrounding environment. They did not, as plaintiffs implicitly contend, have to consider the prior damage done in 1967.

**7.** 33 C.F.R. § 325.3(a) (1979) states:

"§ 325.3 Public notice.

(a) General. The Public notice is the primary method of advising all interested parties of the proposed activity for which a permit is sought and of soliciting comments and information necessary to evaluate the probable impact on the public interest. The notice must, therefore, include sufficient information to give a clear understanding of the nature of the activity to generate meaningful comments. The notice should include the following items of information:

(1) Applicable statutory authority or authorities;

(2) The name and address of the applicant;

(3) The location of the proposed activity;

(4) A brief description of the proposed activity, its purpose and intended use, including a description of the type of structures, if any, to be erected on fills, or pile or float-supported platforms, and a description of the type, composition and quantity of materials to be discharged or dumped and means of conveyance. See also 33 CFR 324 for additional information required on ocean dumping public notices;

(5) A plan and elevation drawing showing the general specific site location and character of all proposed activities, including the size relationship of the proposed structures to the size of the impacted waterway and depth of water in the area;

(6) If the proposed activity would occur in the territorial seas or ocean waters, a description of the activity's relationship to the baseline from which the territorial sea is measured;

(7) A list of other government authorizations obtained or requested, including required certifications relative to water quality, coastal zone management, or marine sanctuaries;

(8) A statement concerning a preliminary determination of the need for and/or availability of an Environmental Impact Statement;

(9) Any other available information which may assist interested parties in evaluating

The notice included the applicable statutory authorities, the name and address of the applicant, the exact location of the proposed activity and its purpose, a plan of the area, and an initial determination that an EIS would not be needed. See 33 C.F.R. § 325.-3(a) (1979).

■ The Corps decision not to hold public hearings does not contravene the provisions of Section 327.4(b) of Title 33 of the Code of Federal Regulations (1979).[8] The Puerto Rico Legal Services requested a public hearing after the comment period specified in the public notice expired. The Natural History Society of Puerto Rico, who is not a party in the case at bar, also requested a hearing. Both petitions were answered in the negative by the Corps who denied the request to hold public hearings as being untimely. We do not find such denial an abuse of discretion. See *Boles v. Onton Dock Inc.,* 659 F.2d 74, 76 (6th Cir.1981),

*Delaware Water Emergency Group v. Hansler,* 536 F.Supp. 26, 45 (E.D.Pa.1981), aff'd 681 F.2d 805 (3rd Cir.1982).

The Corps complied with all the procedures required by the Corps' regulations concerning the preparation of the EA and FONSI. Nor have plaintiffs brought to our attention any procedural irregularities. The EA and FONSI precisely provide sufficient evidence and analysis to determine that Permit No. 80J–5015 would not have a significant effect on the human environment and that an EIS was not needed. See 33 CFR § 325.2(a) 3–6 (1979), 40 C.F.R. 1508.9, 1508.13 (1979).

■ The Corps admits that it did not comply with the CZMA in that it did not require Coco Lagoon to submit a certificate to the effect that Permit No. 80J–5015 complied with the Commonwealth of Puerto Rico's Coastal Zone Management Program.[9] However, the Corps points out that the

the likely impact of the proposed activity, if any, on factors affecting the public interest, including environmental values; and
(10) A reasonable period of time, normally thirty days but not less than fifteen days from date of mailing, within which interested parties may express their views concerning the permit application."

8. Section 327.4(b) states:
"(b) Unless the public notice specifies that a public hearing will be held, any person may request, in writing, within the comment period specified in the public notice on a Department of the Army permit application under Section 404 of the FWPCA or Section 103 of the MPRSA or on a Federal project, that a public hearing be held to consider the material matters in issue in the permit application or Federal project. Upon receipt of any such request, stating with particularity the reasons for holding a public hearing, the District Engineer shall promptly set a time and place for the public hearing, and give due notice thereof, as prescribed in § 327.11 below. Requests for a public hearing under this paragraph shall be granted, unless the District Engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing. The District Engineer will make such a determination in writing, and communicate his reasons therefor to all requesting parties."

9. Section 1456 of the CZMA in its pertinent part states:
"(3)(A) After final approval by the Secretary of a state's management program, any applicant for a required Federal license or permit to conduct an activity affecting land or water uses in the coastal zone of that state shall provide in the application to the licensing or permitting agency a certification that the proposed activity complies with the state's approved program and that such activity will be conducted in a manner consistent with the program. At the same time, the applicant shall furnish to the state or its designated agency a copy of the certification, with all necessary information and data. Each coastal state shall establish procedures for public notice in the case of all such certifications in connection therewith. At the earliest practicable time the state or its designated agency shall notify the Federal agency concerned that the state concurs with or objects to the applicant's certification. If the state or its designated agency fails to furnish the required notification within six months after receipt of its copy of the applicant's certification, the state's concurrence with the certification shall be conclusively presumed. No license or permit shall be granted by the Federal agency until the state or its designated agency has concurred with the applicant's certification or until, by the state's failure to act, the concurrence is conclusively presumed unless the Secretary, on his own initiative or upon appeal by the applicant, finds, after providing a reasonable opportunity for detailed comments from the Federal agency involved and from the state, that the activity is consistent with the objectives of this chapter or is otherwise necessary in the interest of national security."

Commonwealth of Puerto Rico had not adopted a procedure regarding the approval of the certificate as required by the CZMA. Notwithstanding the lack of a set procedure the Corps notified the DNS that an after-the-fact permit to deposit fill on certain wetlands was being requested, and the DNS answered in a positive manner. This was an informal and temporary procedure agreed upon by the concerned State and Federal agencies to comply with the CZMA pending the adoption of a formal certification procedure. The Corps cannot be found at fault when there was no procedure to follow, particularly when, as here, it complied with the spirit of the law. See *No Oilport! v. Carter,* 520 F.Supp. 334, 369 (N.D.Wash.1981). See also 15 C.F.R. § 930.56(b) (1982).

In view of the foregoing the challenged administrative actions are sustained and Plaintiffs' claim is dismissed.

IT IS SO ORDERED.