# IN THE SUPREME COURT OF TEXAS

════════════
No. 10-0121
════════════

THE FINANCE COMMISSION OF TEXAS,
THE CREDIT UNION COMMISSION OF TEXAS, AND
TEXAS BANKERS ASSOCIATION, PETITIONERS,

v.

VALERIE NORWOOD, ELISE SHOWS, MARYANN ROBLES-VALDEZ,
BOBBY MARTIN, PAMELA COOPER, AND CARLOS RIVAS, RESPONDENTS

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

**Argued September 13, 2011**

JUSTICE HECHT delivered the opinion of the Court, in which CHIEF JUSTICE JEFFERSON, JUSTICE GREEN, JUSTICE WILLETT, JUSTICE GUZMAN, JUSTICE LEHRMANN, JUSTICE BOYD, and JUSTICE DEVINE joined, and in Parts I and II of which JUSTICE JOHNSON joined.

JUSTICE JOHNSON issued an opinion concurring in part and dissenting in part, and dissenting from the judgment.

The separation of the powers of government into three distinct, rival branches — legislative, executive, and judicial — is "the absolutely central guarantee of a just Government."[1]  Checks and balances among the branches protect the individual.  It is the separation of powers, for example, that establishes bills of rights as rules of law rather than merely hollow words, which is all they are in

---

[1] *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

most countries where power is vested in a few.[2]  As James Madison famously declared in *Federalist No. 47*: "No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty, than [this:] The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny."[3]

The principle of separation of powers is foundational for federal and state governments in this country and firmly embedded in our nation's history.  The Texas Constitution mandates:

> The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.[4]

Exceptions to the constitutionally mandated separation of powers are never to be implied in the least; they must be "expressly permitted" by the Constitution itself.[5]

A 2003 amendment to the Constitution authorized the Legislature to delegate to a state agency the power to interpret certain provisions of the Texas Constitution governing home equity lending, a power that the Constitution's separation-of-powers provision unquestionably allocates to

---

[2] *Id.* ("Without a secure structure of separated powers, our Bill of Rights would be worthless, as are the bills of rights of many nations of the world that have adopted, or even improved upon, the mere words of ours.").

[3] THE FEDERALIST NO. 47 (James Madison).

[4] TEX. CONST. art. II, § 1.

[5] *Id.*  We do not consider whether exceptions, even expressly permitted by the Constitution, can selectively shift power among the departments of government without infringing on other constitutional guarantees, such as due process, equal protection, and the open courts guarantee of the Texas Constitution.

the Judiciary.[6] We must determine in this case the extent of this exception and specifically, whether agency interpretations made under this authority are beyond judicial review. We conclude they are not.

Of the several agency interpretations challenged in this case, the court of appeals decided that some are valid and others invalid.[7] We agree in part and disagree in part, and render judgment.

# I

In the State of Texas, the homestead has always been protected from forced sale, not merely by statute as in most states, but by the Constitution.[8] The 1869 and 1876 Constitutions allowed three exceptions,[9] and others have been added by amendments.[10] Exceptions for certain home equity loans and for reverse mortgages, finally adopted by constitutional amendment in 1997, effective January 1,

---

[6] *W. Orange-Cove Consol. Indep. Sch. Dist. v. Alanis*, 107 S.W.3d 558, 563 (Tex. 2003) ("The final authority to determine adherence to the Constitution resides with the Judiciary.") (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176-178 (1803), and *Love v. Wilcox*, 28 S.W.2d 515, 520 (Tex. 1930)).

[7] 303 S.W.3d 404 (Tex. App.–Austin 2010).

[8] TEX. CONST. art. VII, § 22 (1845); TEX. CONST. art. VII, § 22 (1861); TEX. CONST. art. VII, § 22 (1866); TEX. CONST. art. XII, § 15 (1869); TEX. CONST. art. XVI, § 50 (1876). In the Republic of Texas, homestead protection was secured by statute. Act approved Jan. 26, 1839, 3d Cong., R.S., 1839 Repub. Tex. Laws 125, 125-26, *reprinted in 2 H.P.N. Gammel, The Laws of Texas 1822–1897* at 125, 125-26 (Austin, Gammel Book Co. 1898).

[9] The 1869 Constitution allowed exceptions for purchase money, taxes, and labor and materials expended on the property. TEX. CONST. art. XII, § 15 (1869). The 1876 Constitution recognized the first two exceptions and limited the third. TEX. CONST. art. XVI, § 50 (1876).

[10] A 1995 amendment added two exceptions, one for an owelty of partition imposed against the entirety of the property by agreement or court order (as in divorce), and the other for refinancing a lien on the property. TEX. CONST. art. XVI, § 50(a)(3), (4). A 1997 amendment added exceptions for certain home equity loans and for reverse mortgages. *Id.* § 50(a)(6), (7). A 2001 amendment added an exception for converting or refinancing a lien on a manufactured home. *Id.* § 50(a)(8).

3

1998,[11] were extremely controversial, in part because of age-old concerns that lenders would be unfair and borrowers unwise, eroding the protection the homestead is intended to afford.[12] So long leery of any impairment to the homestead, Texas was the fiftieth state in the Union to permit home equity lending.[13]

To assure that the compromises finally struck would withstand future political pressures on the Legislature, lengthy, elaborate, detailed provisions, remarkable even for our State's Constitution, were included in Article XVI, Section 50[14] and made nonseverable.[15] A homestead may be subject to forced sale to repay a home equity loan only if the loan meets the requirements of Section 50,

---

[11] Tex. H.R.J. Res. 31, 75th Leg., R.S., 1997 Tex. Gen. Laws 6739 (adopted at the general election on Nov. 4, 1997, by a vote of 698,870 to 474,443).

[12] Professor James Paulsen has provided an excellent description of the long history leading up to the amendment. James W. Paulsen, *Introduction: The Texas Home Equity Controversy in Context*, 26 ST. MARY'S L.J. 307 (1995).

[13] *LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 618 (Tex. 2007) (per curiam) ("For over 175 years, Texas has carefully protected the family homestead from foreclosure by limiting the types of liens that can be placed upon homestead property. Texas became the last state in the nation to permit home-equity loans when constitutional amendments voted on by referendum took effect in 1997."); *see also* House Research Org., Bill Analysis, Tex. H.J.R. 31, 76th Leg., R.S., at 5 (1997).

[14] *See* J. Alton Alsup, *Pitfalls (and Pratfalls) of Texas Home Equity Lending*, 52 CONSUMER FIN. L. Q. REP. 437, 437 (1998) ("The new home equity amendment was . . . an emotionally contested and stubbornly compromised bill . . . subject to a maze of 25, or more, exacting conditions regulating the loan amount, recourse and enforceability, fees and charges, permitted loan terms, and the lender's loan origination and closing practices. And it was not happenstance that these exacting conditions . . . were embedded firmly in the constitution itself without the benefit of enabling legislation that usually accompanies a constitutional amendment to provide an interpretative framework for its implementation. Rather, it reportedly was legislative tactics by reluctant proponents to put any future attempt of fellow legislators to moderate these requirements to the rigors of the identical constitutional amendment process (*i.e.,* requiring a super-majority approval of both houses and a successful voter referendum)."). With just under 6,000 words and over 150 sub-parts, Section 50 is by far the longest, most complex section of the Texas Constitution.

[15] TEX. CONST. art. XVI, § 50(j) ("Subsection (a)(6) and Subsections (e)-(i) of this section are not severable, and none of those provisions would have been enacted without the others.").

alterable only by a vote of the people.[16]  The constitutional amendment did not provide for

implementing legislation or for administrative interpretation or rule-making.  Loan terms and

conditions, notices to borrowers, and all applicable regulations were set out in Section 50 itself.[17]

But not, of course, with perfect clarity.  And for lenders, Section 50 prescribed a Draconian

consequence of noncompliance, whether intentional or inadvertent: not merely the loss of the right

of forced sale of the homestead, but forfeiture of all principal and interest.[18]  On October 7, 1998,

several months after the amendment to Section 50 took effect, four state regulatory agencies with

authority over lenders jointly issued a *Regulatory Commentary on Equity Lending Procedures*.[19]

Noting that the details "[i]nherent in an issue as complex as home equity" lending had not been and

could not be "fully addressed within the text of the amendment" to Section 50, the agencies sought

to "provide guidance to lenders and consumers concerning the regulatory views of the meaning and

---

[16] TEX. CONST. art. XVI, § 1 (proposed constitutional amendments).

[17] Exigency supplanted wisdom.  *See M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819) ("A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be embraced by the human mind.  It would, probably, never be understood by the public.  Its nature, therefore, requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves."); *Ex parte Davis*, 574 S.W.2d 166, 169 n.4 (Tex. Crim. App. 1978) ("Procedural details should not be written into constitutions, but state constitutions should provide for reasonable procedural regulations by legislative enactment.").

[18] Tex. H.R.J. Res. 31, § 1, 75th Leg., R.S., 1997 Tex. Gen. Laws 6739, 6741 (proposing TEX. CONST. art. XVI, § 50(a)(6)(Q)(x), stating that "the lender . . . shall forfeit all principal and interest . . . if the lender . . . fails to comply with the lender's . . . obligations . . . within a reasonable time after the lender . . . is notified by the borrower of the lender's failure to comply").

[19] OFFICE OF CONSUMER CREDIT COMM'R ET AL., REGULATORY COMMENTARY ON EQUITY LENDING PROCEDURES 1 (Oct. 7, 1998) [hereinafter *Regulatory Commentary*], *available at* http://www.fc.state.tx.us/homeinfo/homeq2.pdf and http://www.occc.state.tx.us/pages/Legal/commentary.htm (last visited June 17, 2013).

effect" of the amendment.[20]   But the agencies warned that "a court may or may not defer to this interpretation."[21]

A few weeks later, the Attorney General wrote in an opinion that "the amendment has given rise to numerous questions regarding its construction" and

> does not authorize the legislature to enact general implementing legislation or empower a state agency to adopt interpretive rules.  Consequently, the state is faced with an environment of uncertainty as to how lenders, builders, insurers, borrowers, and others may properly negotiate enforceable home equity loans.[22]

Furthermore, the Attorney General continued,

> [t]he Legislature has no authority to interpret or declare a matter of constitutional construction, nor may it delegate such authority to an administrative agency.  To do so, absent express constitutional authorization, would be to usurp the powers of the judiciary in violation of the separation of powers principles set out in article II, section 1 of the Texas Constitution. . . . [A]s section 50 now stands, neither the legislature nor any state agency has the power to declare definitively what it means. The ultimate power to construe constitutional provisions lies solely with the courts.[23]

"As a rule, court decisions apply retrospectively,"[24] and thus a lender faced the prospect that its loans could be forfeited long after they were made, based on judicial decisions in cases in which it was not

---

[20] *Id.* at 1.

[21] *Id.  See Stringer v. Cendant Mortg. Corp.*, 23 S.W.3d 353, 357 (Tex. 2000) (noting that the *Regulatory Commentary* "is advisory and not authoritative").

[22] Tex. Att'y Gen. Op. No. DM-495 (1998).

[23] *Id.* (internal quotation marks and footnotes omitted).  *See City of Dallas v. Stewart*, 361 S.W.3d 562, 568 (Tex. 2012) ("Agencies, we have held, lack the ultimate power of constitutional construction.") (citing *Cent. Power & Light Co. v. Sharp*, 960 S.W.2d 617, 618 (Tex. 1997)).

[24] *Centex Homes v. Buecher*, 95 S.W.3d 266, 277 (Tex. 2002).

even involved. The risk was understandably viewed as having a dampening effect on the home equity lending market.

To solve the problem, the Attorney General advised that "the constitution could be amended to give to an executive agency judicial-type interpretive powers with respect to the home equity amendment."[25] Consequently, in 2003 the Legislature proposed, and the people adopted, Section 50(u), which states:

> The legislature may by statute delegate one or more state agencies the power to interpret Subsections (a)(5)-(a)(7), (e)-(p), and (t), of this section. An act or omission does not violate a provision included in those subsections if the act or omission conforms to an interpretation of the provision that is:
>
> (1) in effect at the time of the act or omission; and
>
> (2) made by a state agency to which the power of interpretation is delegated as provided by this subsection or by an appellate court of this state or the United States.[26]

The referenced subsections which the legislatively designated state agencies are empowered to interpret contain essentially all the provisions governing home equity lending. Thus, the first sentence addresses the perceived need for a less cumbersome interpretative process than that afforded by litigation. The second sentence creates a safe harbor for lenders, relieving them of

---

[25] Tex. Att'y Gen. Op. No. DM-495. The Attorney General added: "We do not advise you on the wisdom of this or any other particular action."

[26] Tex. S.J. Res. 42, 78th Leg., R.S., 2003 Tex. Gen. Laws 6219, 6225 (adopted at the general election on Sept. 13, 2003, by a vote of 862,009 to 455,707). The amendment also added Section 50(a)(6)(Q)(x)(a)-(f), 2003 Tex. Gen. Laws at 6222, specifying ways in which lenders can rectify noncompliance after the fact and so avoid forfeiture of principal and interest. Very generally, rectification may require repayment of overcharges, reduction in the amount of the lien, modification of terms, delivery of documents required to be furnished, abatement of interest and other obligations, and a $1,000 credit with an offer to refinance on the same terms at no cost. TEX. CONST. art. XVI, § 50(a)(6)(Q)(x)(a)-(f).

liability for any constitutional violations as long as agency interpretations are followed.[27]  But

importantly, it does so not merely by excusing a violation; it states that no violation even occurs.

A lender's compliance with an agency interpretation of Section 50, even a wrong interpretation, is

compliance with Section 50 itself.

In anticipation of the people's adoption of the 2003 amendments, the Legislature delegated

interpretative authority under Section 50(u) to the Finance Commission and the Credit Union

Commission ("the Commissions"), subject to the Administrative Procedure Act.[28]  By statute:

> The finance commission is responsible for overseeing and coordinating the
> Texas Department of Banking, the Department of Savings and Mortgage Lending,
> and the Office of Consumer Credit Commissioner and serves as the primary point of
> accountability for ensuring that state depository and lending institutions function as
> a system, considering the broad scope of the financial services industry.  The finance
> commission is the policy-making body for those finance agencies and is not a
> separate state agency.  The finance commission shall carry out its functions in a
> manner that protects consumer interests, maintains a safe and sound banking system,
> and increases the economic prosperity of the state.[29]

---

[27] Following judicial interpretations also insulates lenders from liability, but that aspect of the provision is not at issue in this case.

[28] Act of May 25, 2003, 78th Leg., R.S., ch. 1207, 2003 Tex. Gen. Laws 3427 (effective Sept. 13, 2003), enacting TEX. FIN. CODE §§ 11.308 & 15.413.

Section 11.308 states: "The finance commission may, on request of an interested person or on its own motion, issue interpretations of Sections 50(a)(5)-(7), (e)-(p), (t), and (u), Article XVI, Texas Constitution.  An interpretation under this section is subject to Chapter 2001, Government Code [the Administrative Procedure Act], and is applicable to all lenders authorized to make extensions of credit under Section 50(a)(6), Article XVI, Texas Constitution, except lenders regulated by the Credit Union Commission.  The finance commission and the Credit Union Commission shall attempt to adopt interpretations that are as consistent as feasible or shall state justification for any inconsistency."

Similarly, Section 15.413 states: "The commission may, on request of an interested person or on its own motion, issue interpretations of Sections 50(a)(5)-(7), (e)-(p), (t), and (u), Article XVI, Texas Constitution.  An interpretation under this section is subject to Chapter 2001, Government Code, and is applicable to lenders regulated by the commission.  The Finance Commission of Texas and the commission shall attempt to adopt interpretations that are as consistent as feasible or shall state justification for any inconsistency."

[29] TEX. FIN. CODE § 11.002(a).

The Credit Union Commission, together with its Commissioner and the employees of the Credit Union Department, is responsible for "supervis[ing] and regulat[ing] credit unions".[30] The Finance Commission and the Credit Union Commission have eleven and nine members, respectively, all appointed by the Governor with the advice and consent of the Senate, each for a six-year term.[31] Both Commissions have general rule-making power apart from their delegated authority to interpret Section 50.[32]

The Commissions quickly published proposed interpretations generally following the *Regulatory Commentary*, invited public comment, conducted a public hearing, and issued final interpretations effective January 8, 2004.[33] Three weeks later, six homeowners ("the Homeowners")[34] brought this action against the Commissions, challenging several of the interpretations. The Texas Bankers Association (the "TBA") intervened. By final summary

---

[30] *Id.* §§ 15.101-.102.

[31] *Id.* §§ 11.101(a)-(b), 15.201(a)-(b).

[32] *Id.* §§ 11.301, 11.302, 11.304, 11.306, 11.307, 11.309, 15.402, 15.4022, 15.4024, 15.501.

[33] 7 TEX. ADMIN. CODE §§ 153.1-.96. Interpretations were published November 7, 2003, and adopted December 19, 2003. 28 Tex. Reg. 9656-9653 (2003), 29 Tex. Reg. 84-96 (2004).

[34] The Homeowners are Valerie Norwood, Elise Shows, Maryann Robles-Valdez, Bobby Martin, Pamela Cooper, and Carlos Rivas. The other original plaintiff, Association of Community Organizations for Reform Now, has withdrawn from the case.

judgment, the trial court invalidated many of the interpretations.[35] A divided court of appeals affirmed in part and reversed in part.[36]

As the case comes to us, the substantive disputes over the Commissions' interpretations have been winnowed to three:

*First*: Section 50(a)(6)(E) caps "fees to any person that are necessary to originate, evaluate, maintain, record, insure, or service the extension of credit" at three percent of principal. Fees do not include "any interest".[37] Did the Commissions correctly give "interest" the same meaning as Section 301.002(a)(4) of the Texas Finance Code,[38] which includes fees paid to the lender, thereby removing lender fees from the cap?[39] The court of appeals held they did not. The statutory definition of

---

[35] The court invalidated the interpretation defining "interest" excluded from the fee cap imposed by Section 50(a)(6)(E), 7 TEX. ADMIN. CODE § 153.1(11), and related interpretations, *id.* §§ 153.5(3), (4), (6), (8), (9), and (12). The court denied the Homeowners' challenges to interpretations allowing mailing of consent and closing by a borrower's attorney-in-fact, *id.* §§ 153.15(2)-(3), and allowing a rebuttable presumption of timely disclosure by mail before closing, *id.* §§ 153.51(1), (3). These three rulings remain at issue. Other interpretations invalidated by the trial court — *id.* §§ 153.12(2), 153.13(4), 153.18(3), 153.20, 153.22 and 153.84(1) — have since been amended or repealed by the Commissions and are no longer at issue. 31 Tex. Reg. 5080-5085, 9022-9023 (2006); 33 Tex. Reg. 5295-5297, 9074-9078 (2008).

[36] 303 S.W.3d 404 (Tex. App.–Austin 2010).

[37] The excerpted provision is structured as follows. Section 50(a) states that a homestead is protected from forced sale with certain exceptions. One exception is a home equity loan that meets the requirements of Section 50(a)(6). One such requirement, in Section 50(a)(6)(E), is that the loan "does not require the owner or the owner's spouse to pay, in addition to any interest, fees to any person that are necessary to originate, evaluate, maintain, record, insure, or service the extension of credit that exceed, in the aggregate, three percent of the original principal amount of the extension of credit[.]"

[38] Section § 301.002(a)(4) provides: "In this subtitle . . . 'Interest' means compensation for the use, forbearance, or detention of money. The term does not include time price differential, regardless of how it is denominated. The term does not include compensation or other amounts that are determined or stated by this code or other applicable law not to constitute interest or that are permitted to be contracted for, charged, or received in addition to interest in connection with an extension of credit."

[39] 7 TEX. ADMIN. CODE § 153.1 ("These words and terms have the following meanings when used in this section, unless the context indicates otherwise: . . . (11) Interest — interest as defined in the Texas Finance Code § 301.002(4) and as interpreted by the courts."). *See also id.* § 153.5(3) ("Charges that are Interest. Charges an owner or an owner's

10

interest, the court reasoned, is as broad as it is to protect borrowers from usury.[40] The broader the concept of interest, the greater the protection. But "[i]n the home equity lending context, incorporating the extremely broad usury definition of interest would defeat the purpose of the constitutional provision imposing a fee cap in the first place."[41] Broadening "interest" in Section 50(a)(6)(E) reduces protection. By "exclud[ing] basically all fees charged by the lender from the cap", the court concluded, "[t]he Commissions' interpretation . . . essentially renders [the] cap meaningless . . . contrary to the intent and plain meaning of the constitution."[42]

*Second*: Section 50(a)(6)(N) provides that a loan may be "closed only at the office of the lender, an attorney at law, or a title company".[43] According to the Commissions:

<hr>

spouse is required to pay that constitute interest under the law, for example per diem interest and points, are not fees subject to the three percent limitation."); *id.* § 153.5(4) ("Charges that are not Interest. Charges an owner or an owner's spouse is required to pay that are not interest are fees subject to the three percent limitation."); *id.* § 153.5(6) ("Charges to Originate. Charges an owner or an owner's spouse is required to pay to originate an equity loan that are not interest are fees subject to the three percent limitation."); *id.* § 153.5(8) ("Charges to Evaluate. Charges an owner or an owner's spouse is required to pay to evaluate the credit decision for an equity loan, that are not interest, are fees subject to the three percent limitation. Examples of these charges include fees collected to cover the expenses of a credit report, survey, flood zone determination, tax certificate, title report, inspection, or appraisal."); *id.* § 153.5(9) ("Charges to Maintain. Charges paid by an owner or an owner's spouse at the inception of an equity loan to maintain the loan that are not interest are fees subject to the three percent limitation. Charges that are not interest that an owner pays at the inception of an equity loan to maintain the equity loan, or that are customarily paid at the inception of an equity loan to maintain the equity loan, but are deferred for later payment after closing, are fees subject to the three percent limitation."); *id.* § 153.5(12) ("Charges to Service. Charges paid by an owner or an owner's spouse at the inception of an equity loan for a party to service the loan that are not interest are fees subject to the three percent limitation. Charges that are not interest that an owner pays at the inception of an equity loan to service the equity loan, or that are customarily paid at the inception of an equity loan to service the equity loan, but are deferred for later payment after closing, are fees subject to the three percent limitation."). The *Regulatory Commentary* had stated: "The word 'interest' means interest as defined in the *Texas Credit Title* and as interpreted by the courts of the state of Texas." *Supra* note 19, at 3.

[40] 303 S.W.3d at 410, 412.

[41] *Id.* at 411.

[42] *Id.* at 412.

[43] This is required for a home equity loan to fall within the Section 50(a)(6) exception.

11

> This provision was intended to prohibit the coercive closing of an equity loan at the home of the owner. The requirement that the closing occur at the physical address of the lender, attorney, or title company eliminates the possibility of the closing occurring at the residence of the owner, and also eliminates confusion on the part of the owner who wishes to rescind an equity loan.[44]

Nevertheless, the Commissions interpreted this provision to allow a borrower to mail a lender the required consent to having a lien placed on his homestead[45] and to attend closing through his attorney-in-fact.[46] Was this correct?[47] The court of appeals held it was, reasoning that when Section 50 prohibits the use of a power of attorney, it does so expressly — as in Section 50(a)(6)(Q)(iv), to facilitate obtaining a judgment against a debtor.[48]

> The use of powers of attorney to designate an attorney-in-fact to act on the designor's behalf is a recognized principle of Texas law. As a result, it is neither inconsistent with the constitution nor impermissible rulemaking for the Commissions to clarify that this principle continues to apply in the context of home equity loan closings, particularly where the drafters expressly prohibited the use of powers of attorney in other home equity lending contexts, but not with regard to closing the loan.[49]

---

[44] 29 Tex. Reg. 84, 90 (2004).

[45] 7 TEX. ADMIN. CODE § 153.15(3) ("A lender may receive consent required under Section 50(a)(6)(A) by mail or other delivery of the party's signature to an authorized physical location and not the homestead."). The Constitution, at art. XVI, Section 50(a)(6)(A), provides that a valid voluntary lien securing a home equity loan can be created only "under a written agreement with the consent of each owner and each owner's spouse".

[46] 7 TEX. ADMIN. CODE § 153.15(2) ("A lender may accept a properly executed power of attorney allowing the attorney-in-fact to execute closing documents on behalf of the owner.").

[47] The *Regulatory Commentary* had stated: "If the transaction is closed at one of [the offices specified in Section 50], but lacks the consent of a spouse or other party, it is permissible to obtain that individual's consent by mail. A properly executed power of attorney is acceptable for designating an individual to close the loan on behalf of the owner." *Supra* note 19, at 7.

[48] Another requirement a home equity loan must satisfy to come within the Section 50(a)(6) exception is that "the owner of the homestead not sign a confession of judgment or power of attorney to the lender or to a third person to confess judgment or to appear for the owner in a judicial proceeding". TEX. CONST. art. XVI, § 50(a)(6)(Q)(iv).

[49] 303 S.W.3d at 417 (citations omitted).

Further, the court concluded, allowing a borrower to mail documents to a lender was not unreasonable.[50]

*Third*: Section 50(g) requires that a loan not be closed before the 12th day after the lender "provides" the borrower the prescribed notice.[51] Did the Commissions correctly interpret Section 50(g) to permit a rebuttable presumption that notice is received, and therefore provided, three days after it is mailed?[52] The court of appeals concluded that "[t]he Commissions' regulations merely interpret the appropriate way to determine whether [provision of notice] has occurred and to establish compliance with the notice requirement. It is for precisely that type of guidance that the Commissions were authorized to issue interpretations in the first place."[53]

At the outset, we must decide two jurisdictional issues. First is whether Section 50(u) deprives the Judiciary of the power to review the Commissions' interpretations. Concluding that it does not, we then determine whether, as the dissent argues, the Homeowners lack standing to assert

---

[50] *Id.*

[51] The provision reads in relevant part: "An extension of credit described by Subsection (a)(6) of this section may be secured by a valid lien against homestead property if the extension of credit is not closed before the 12th day after the lender provides the owner with the following written notice on a separate instrument . . . ."

[52] 7 TEX. ADMIN. CODE § 153.51(1), (3) ("(1) If a lender mails the consumer disclosure to the owner, the lender shall allow a reasonable period of time for delivery. A period of three calendar days, not including Sundays and federal legal public holidays, constitutes a rebuttable presumption for sufficient mailing and delivery. . . . (3) A lender may rely on an established system of verifiable procedures to evidence compliance with this section."). The *Regulatory Commentary* had stated: "A lender should establish verifiable procedures to ensure that an owner receives the required notice within the specified time frame. If a lender mails the notice to the owner, the lender shall allow a reasonable period of time for delivery. A three day period not including Sundays and legal holidays, constitutes a rebuttable presumption for sufficient mailing and delivery." *Supra* note 19, at 11.

[53] 303 S.W.3d at 418 (footnote omitted).

their claims.  Finding that the Homeowners have standing, we at last turn to each of the three substantive challenges to the Commissions' interpretations.

## II

The Commissions' position on the effect of Section 50(u) is not entirely clear.  They contend in their merits brief that Section 50(u) "alter[s] basic separation-of-powers principles by empowering the Commissions with definitive interpretative authority over the meaning of the home equity lending provisions."[54]  Consequently — they argue later in their brief — "judicial review *of the substance of* [their] *interpretations* ought to be exceptionally limited, if not wholly prohibited."[55] In the same paragraph, however, they assert that Section 50(u) "places the Commissions' interpretations on equal footing with those issued by courts of appeals",[56] which, of course, are subject to non-deferential, *de novo* judicial review — by the Supreme Court of Texas.  In the next paragraph, the Commissions acknowledge that their authority is not exclusive and that courts can interpret Section 50, too, and can construe the meaning of the Commissions' interpretations.[57]  The next sentence states: "Moreover, courts would still serve the meaningful function of ensuring that any interpretation promulgated by the Commissions actually 'interprets' the Constitution."[58]  If the sentence means that a court can determine that an interpretation actually misinterprets Section 50,

---

[54] Brief on the Merits of Petitioners Finance Commission of Texas and Credit Union Commission of Texas [hereinafter "Commissions' Brief"] 7.

[55] *Id.* at 14.

[56] *Id.*

[57] *Id.* at 14-15.

[58] *Id.* at 15.

it is not clear how that differs from judicial review that "ought to be . . . wholly prohibited"; and if

the sentence means that courts can do something else that is still meaningful, it is not clear what that

is, exactly. Another sentence later, the Commissions acknowledge that their interpretations are

subject to the Administrative Procedure Act and "could . . . be challenged for failure to substantially

comply with [the Act's] procedural requirements".[59] But the Commissions never explain why

another provision of the Act — that "[t]he validity . . . of a rule . . . may be determined in an action

for declaratory judgment"[60] — does not equally apply.[61] Finally, at oral argument, counsel for the

Commissions stated that "fortunately, it isn't even necessary to reach the question of whether judicial

review is totally excluded in this case because the Commissions' challenged interpretations satisfy

the ordinary deference standard" of review that should be applied.[62]

On the last point, the law is absolutely clear. If Section 50(u) precludes judicial review, then

the courts have no jurisdiction over the Homeowners' challenges, and we must dismiss the case

without reaching the merits. "Without jurisdiction the court cannot proceed at all in any cause; it

may not assume jurisdiction for the purpose of deciding the merits of the case."[63]

---

[59] *Id.*

[60] TEX. GOV'T CODE § 2001.038(a). "Rule" is defined as "a state agency statement of general applicability that (i) implements, interprets, or prescribes law or policy . . . ." *Id.* § 2001.003(6)(A)(i). The parties have not argued that the Commissions' interpretations should not be treated as rules for purposes of Section 2001.038.

[61] The Commissions argue only that the Homeowners lack standing to bring a declaratory judgment action. *See* Commissions' Supplemental Brief Addressing Jurisdiction 4-7; Commissions' Response Brief Addressing Jurisdiction 1.

[62] Transcript of Oral Argument at *2, *Fin. Comm'n of Texas v. Norwood*, No. 10-0121 (Tex. argued Sept. 13, 2011), *available at* http://www.supreme.courts.state.tx.us/oralarguments/transcripts/10-0121.pdf.

[63] *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (internal quotation marks omitted) (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94 (1998)).

> [T]he denial of a claim on the merits is not an alternative to dismissal for want of jurisdiction merely because the ultimate result is the same because the assertion of jurisdiction "carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers."[64]

We must determine the effect of Section 50(u).

The purpose of Section 50(u), the Commissions agree, was to remove market uncertainty over the exact meaning of home equity lending provisions.[65] This it did by allowing for administrative interpretations of the provisions and giving those interpretations constitutional authority, equating compliance with them to compliance with the Constitution itself. Judicial review of the Commissions' interpretations does not impair Section 50(u)'s purpose in the least, but rather, assures that the interpretations adhere to the meaning of the constitutional provisions. To read Section 50(u) as giving the Commissions interpretative authority that is absolute and unreviewable — as the Commissions at times seem to read this section — would defeat the purpose of constitutionalizing home equity lending procedures in the first place: to shield them from political pressures in the legislative and executive departments of government. The Executive could influence interpretations through its power to appoint members of the Commissions, and the Legislature could exert similar influence through statutes governing the Commissions' functions. Indeed, as we will see later, the Legislature could directly alter the meaning of constitutional provisions by amending statutes used by the Commissions to define constitutional terms —

---

[64] *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 307 (Tex. 2008) (quoting *Steel Co.*, 523 U.S. at 94).

[65] Commissions' Brief 18 ("Indeed, the entire purpose of § 50(u)'s delegation of interpretive authority to the Commissions was to enable the agencies to clarify the restrictions set forth throughout § 50(a)(6) in order to increase certainty and spur home equity lending.").

"interest", for example. Instead of requiring a constitutional amendment to change home equity lending procedures, a constitutional amendment would be required to change the Commissions' interpretations. Nothing in Section 50(u) or the history of its adoption suggests that the framers and ratifiers of the 2003 amendment to Section 50 intended to upend the fundamental goal of the 1997 amendment.[66]

Moreover, so expansive a reading of Section 50(u) violates the requirement of Article II, Section 1 that exceptions to the separation of powers be expressly stated. Section 50(u) authorizes the Legislature to confer interpretative authority on designated agencies, but nothing more. Indeed, Section 50(u)(2) expressly contemplates that the constitutional provisions will be interpreted not only by the agencies delegated that task but by state and federal courts as well, extending the safe harbor to include all interpretations, administrative and judicial. And as the Commissions argue, Section 50(u) seems to equate administrative interpretations with those of appellate courts, which — except for decisions of the United States Supreme Court — are subject to review. Every implication of Section 50(u) is that judicial review is not foreclosed, and that seems to be the Legislature's understanding in subjecting the Commissions' interpretations to the Administrative Procedure Act, which provides for judicial review.

Accordingly, we conclude that the Commissions' interpretations of Section 50 are subject to judicial review.

---

[66] *Sears v. Bayoud*, 786 S.W.2d 248, 251 (Tex. 1990) ("[I]n construing a constitutional provision, this Court has always given effect to the intention of the framers and ratifiers of the provision.").

# III

In the trial court and court of appeals, and in the initial briefing and argument in this Court, neither the Commissions nor the TBA suggested that the Homeowners lacked standing to sue, and the lower courts never raised the issue themselves. But after oral argument, the Court directed the parties to brief the subject. Because standing is required for subject-matter jurisdiction, it can be — and if in doubt, must be — raised by a court on its own at any time.[67]

Standing and other concepts of justiciability[68] have been "developed to identify appropriate occasions for judicial action"[69] and thus maintain the proper separation of governmental powers. As Justice Frankfurter observed, "[w]hether 'justiciability' exists . . . has most often turned on evaluating both the appropriateness of the issues for decision by courts and the hardship of denying judicial relief."[70] We have explained the doctrine of standing as follows:

> The requirement in this State that a plaintiff have standing to assert a claim derives from the Texas Constitution's separation of powers among the departments of government, which denies the judiciary authority to decide issues in the abstract, and from the Open Courts provision, which provides court access only to a "person for an injury done him". A court has no jurisdiction over a claim made by a plaintiff without standing to assert it. For standing, a plaintiff must be personally aggrieved; his alleged injury must be concrete and particularized, actual or imminent, not hypothetical.[71]

---

[67] *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445-446 (Tex. 1993).

[68] "The central concepts often are elaborated into more specific categories of justiciability —– advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions." 13 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 3529 (3d ed. 2008).

[69] *Id.*

[70] *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 156 (1951) (Frankfurter, J., concurring).

[71] *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304-305 (Tex. 2008).

"Generally", we recently wrote in *Andrade v. NAACP of Austin*, "a citizen lacks standing to bring a lawsuit challenging the lawfulness of governmental acts."[72] But we added, "[t]he line between a generalized grievance and a particularized harm is difficult to draw, and *it varies with the claims made*."[73] "[T]he proper inquiry", we stated, "is whether the plaintiffs sue solely as citizens who insist that the government follow the law."[74]

*Andrade* illustrates that whether an injury is sufficiently "concrete", "particularized", "actual or imminent", and "not hypothetical" for standing depends on the context in which the claim is asserted. There, registered voters sued the Secretary of State, asserting that she exceeded her authority in certifying the use of electronic voting machines that do not produce a contemporaneous paper record of each vote.[75] The plaintiffs alleged that the machines were susceptible to being fraudulently manipulated and prone to malfunction, and that the lack of a paper record of each vote, made the moment the vote was cast, prevented a determination whether the votes counted by the machines were actually those that were cast.[76] They complained that because they were forced to use the machines while other voters were not, and their votes were less likely to be counted than others', their statutory right to a recount and their constitutional right to equal protection of the law

---

[72] 345 S.W.3d 1, 7 (Tex. 2011).

[73] *Id.* at 8 (emphasis added).

[74] *Id.*

[75] *Id.* at 6.

[76] *Id.* at 6, 10.

was violated.[77]  Relying on the United States Supreme Court's seminal decision in *Baker v. Carr*,[78] we concluded:

> If such impairment does produce a legally cognizable injury, [the plaintiffs] are among those who have sustained it.  Because they assert a plain, direct and adequate interest in maintaining the effectiveness of their votes, not merely a claim of the right, possessed by every citizen, to require that the Government be administered according to law, the voters have standing to pursue their equal protection claim.[79]

We noted that our analysis could be different for equal-protection complaints unrelated to voting.[80]

In the present case, a unique consideration in determining the Homeowners' standing is the safe-harbor provision in Section 50(u), by which a home equity lender's conduct in compliance with the Commissions' interpretations does not violate Section 50 and therefore cannot injure a borrower. For example, a lender may charge fees permitted by the Commissions' interpretation of the constitutional cap, even if the interpretation is incorrect, and the borrower is not only denied redress, he has not even been overcharged.  Even if the Commissions' interpretations are later determined to be wrong, they still, while in effect, substitute for Section 50's provisions.[81]  A home equity borrower cannot be injured by a lender's compliance with the Commissions' interpretations because nothing illegal has occurred.  To have complied with the interpretations is to have complied with the Constitution itself.

---

[77] *Id.*

[78] 369 U.S. 186, 207-208 (1962).

[79] *Andrade v. NAACP of Austin,* 345 S.W.3d 1, 6, 10 (Tex. 2011) (internal quotation marks omitted).

[80] *Id.* (citing *Tex. Dep't. of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646-647 (Tex. 2004)).

[81] We do not consider the effect of an interpretation adopted in violation of procedural requirements.

Injury lies only in the Commissions' misinterpretation of Section 50, and then only to a person's interest in obtaining a home equity loan in the future. To return to the fee example, once a loan has closed and the fees have been paid according to the Commissions' interpretations, no injury has occurred. Injury can exist only in the prospect of having to pay fees that, though permitted by the interpretations, are excessive under Section 50.

Were this injury insufficient to confer standing to challenge the Commissions' interpretations, their authority to interpret Section 50 would be final and absolute, not merely shared with the Judiciary. But the principle of standing exists to protect the separation of powers, not to defeat it. Standing operates to prevent the Judiciary from exercising authority that belongs to other departments of government, not to deprive the Judiciary of its role in interpreting law, especially constitutional law. The requirement of standing cannot be used to alter the separation of powers. And in any event, we have concluded that the Commissions' authority is not absolute.

It follows that injury to the interest in obtaining a home equity loan resulting from the Commissions' alleged misinterpretations of Section 50 is sufficient for standing. The parties agree (though the Commissions still do not concede that their interpretations are subject to judicial review).[82] They disagree only over whether the Homeowners have sufficiently pleaded the requisite interest. The Homeowners alleged in their pleadings that each "took out a home equity loan" and

---

[82] The Commissions' Response Brief Addressing Jurisdiction 1 (stating that an "inten[t] to acquire an additional home equity loan . . . is all that is required to establish standing in this case"); Texas Bankers Association's Post-Submission Response Brief 6 ("This Court should hold that, as Texas homeowners eligible to obtain future home equity financing, the Homeowners have standing to challenge the Commissions' interpretative rules."); Homeowners' Response to Supplemental Brief on Jurisdiction 1 ("All parties agree that if [Homeowners] have an interest in obtaining a home equity loan in the future, they have standing . . . .").

that the Commissions "have adopted interpretations and rules in violation of the Texas Constitution which interfere with or impair, or threaten to interfere with or impair, a legal right or privilege of Plaintiffs."[83] The Commissions argue that "[a]dding one simple allegation . . . should suffice to establish jurisdiction: . . . an intent to acquire an additional home equity loan."[84] The Homeowners respond that their prospective interest in home equity loans, sufficient for standing, is implicit in their pleadings,[85] liberally construed as they must be when standing is questioned for the first time by an appellate court.[86] The TBA agrees.[87]

---

[83] The Commissions' authority to interpret Section 50 is subject, under TEX. FIN. CODE §§ 11.308 & 15.413, to the Administrative Procedure Act, which permits judicial review of a rule adopted by a state agency "if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." TEX. GOV'T CODE § 2001.038(a). The Homeowners' pleadings track this language and thus allege the injury required by the Act for judicial review. The Act does not purport to set a higher standard than that set by the general doctrine of standing, and it cannot be lower, since courts' constitutional jurisdiction cannot be enlarged by statute. *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 462 (Tex. 2011) ("If the grant of jurisdiction or the relief authorized in the statute exceeds the limits of [the Constitution], then we simply exercise as much jurisdiction over the case as the Constitution allows . . . ."). We treat the Act's requirement as but another expression of the general doctrine of standing.

[84] The Commissions' Supplemental Brief Addressing Jurisdiction 8. The Commissions also argue that the case should not be dismissed but should be remanded to the trial court for the Homeowners to amend their pleadings, and in remanding this Court "should address both the standing requirement and the merits of the [Homeowners'] claims in order to provide guidance for the trial court". *Id.* at 9. This, the Commissions contend, "is the best way to capitalize upon (and avoid squandering) the substantial judicial resources that have already been spent by this Court, the lower courts, and all of the parties in litigating the substantive challenge to the Commissions' interpretations over the past seven years." *Id.*

[85] Homeowners' Response to Supplemental Brief on Jurisdiction 1 ("While the Homeowners' live petition does not expressly state each Homeowner has an interest in obtaining a home equity loan in the future, this is fairly implied if the petition is construed liberally toward the pleader's intent.").

[86] *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993) ("When an appellate court questions jurisdiction on appeal for the first time . . . and reviews the standing of a party sua sponte, it must construe the petition in favor of the party [seeking to invoke the court's jurisdiction], and if necessary, review the entire record to determine if any evidence supports standing.").

[87] Texas Bankers Association's Post-Submission Response Brief 2 ("The Homeowners have alleged they are Texas homeowners. Under the Texas Constitution they are, therefore, the class of people eligible to obtain home equity financing — or refinancing. As a result, they are subject, prospectively, to the Commissions' interpretations of the Texas Constitution's home equity lending provisions. This Court could correctly conclude the Homeowners have standing to

22

So do we. The Homeowners' allegation that the Commissions' interpretations "threaten to interfere with or impair [their] legal right[s]" cannot be true unless they have a prospective interest in considering home equity loans. And such interest is unquestionably affected by the Commissions' interpretations. The TBA confirms what should come as no surprise: that whenever home equity loans are made, "[b]ecause the banking industry has conformed its practices to the Commissions' interpretative rules to obtain the Texas Constitution's safe harbor protections, there is no doubt Texas homeowners will find the terms of home equity loans still governed by the Commissions' rules."[88] Even if the Homeowners' interest were solely in refinancing existing home equity loans, the refinancing would have to satisfy the requirements of Section 50.[89]

The Homeowners need not allege a more imminent impairment to their rights or allege a threat with more specificity. While the certainty and extent of injury would become clearer as the time for closing a home equity loan approached, the terms were fixed, and the application of the Commissions' interpretations became apparent, to require a homeowner to wait to that point to

___

challenge the Commissions' interpretative rules."). Alternatively, the TBA joins the Commissions in urging that the Court allow the Homeowners to cure their pleadings and address the substance of the Homeowners' challenges either in the process of doing so or afterward. *Id.* at 7-8 ("Alternatively, if the Court determines the Homeowners have not established on the trial record that their challenge to the Commissions' interpretative rules is a live controversy that they have standing to litigate, Texas Bankers Association supports the Commissions' request that the Court give the Homeowners the opportunity to do so. If the Court is not inclined, as the Commissions propose, to decide the merits of the Homeowners' constitutional challenges before resolving whether they have standing to litigate those claims, the Court could, alternatively, abate this appeal; remand to the trial court to allow the Homeowners to amend their pleadings or present additional evidence to support standing and a live controversy; and then, once they have established those jurisdictional elements, lift the abatement and decide the merits of their constitutional challenges.").

[88] *Id.* at 6-7.

[89] TEX. CONST. art. XVI, § 50(f) ("A refinance of debt secured by the homestead, any portion of which is an extension of credit described by Subsection (a)(6) of this section, may not be secured by a valid lien against the homestead unless the refinance of the debt is an extension of credit described by Subsection (a)(6) or (a)(7) of this section.").

challenge an interpretation would be to deny review or deny credit, or both. This case was filed more than nine years ago. Changes in values and rates, and in lenders' and borrowers' individual circumstances, ordinarily require that loan closings occur in a matter of weeks, not years. And hard as it may be to foretell obtaining a loan, predicting the terms is completely impossible.

Importantly, impairment of the Homeowners' rights is threatened not only by having to close a home equity loan under misinterpretations of constitutional requirements but also by having to decide whether to seek credit in such a situation. The decision whether to apply for a home equity loan is necessarily influenced by its terms, and to return yet again to the fee cap example, its cost. Knowing that fewer fees are capped obviously discourages borrowers. The homeowner who does not intend to apply for a home equity loan and will probably not obtain one, all because of incorrect interpretations of Section 50, is no less injured than the homeowner whose loan is closed under such misinterpretations. The influence of the Commissions' interpretations on whether even to apply for a home equity loan is injury enough to give the Homeowners standing.

The dissent does not disagree and "recognize[s] that the circumstances before us are unusual",[90] but regards the Homeowners' allegation that the Commissions' interpretations "threaten to interfere with or impair [their] legal right[s]" as insufficiently factual. We think that to insist on greater specificity is unreasonable, as we have explained. How the fee cap will operate for any particular loan cannot be predicted with any accuracy until the underwriting is complete. Nor can a prospective borrower predict how he or she may be impacted by other misinterpretations asserted

---

[90] *Post* at ___.

by the Homeowners: the requirements that closing occur away from the borrower's home and that the borrower be shown to have the required notice. The dissent suggests that the Homeowners could allege that the asserted misinterpretations adversely affected them when they obtained their home equity loans in the past, if such were the case. But the dissent misunderstands the nature and effect of the safe-harbor provision, characterizing it as "protect[ing] lenders from liability for their lending actions much as statutes of limitations protect parties from liability for stale claims."[91] A lender's compliance with a misinterpretation of Section 50 is not an injury for which a borrower is barred from seeking redress; it is no injury at all. It would certainly be a perverse application of the standing doctrine to require pleading of a non-existent injury.

Section 50(u) creates an exceptional context in which to assess standing. So do voting rights, as we acknowledged in *Andrade*. In that case, there was only a possibility that the plaintiffs would vote in the future, and if they did, there was no proof at all that the machines to which they objected would be used, would be improperly programmed, or would malfunction, or that their votes would be inaccurately counted. Though the standing doctrine would insist on a more substantial injury in other contexts, voting rights present a special situation. The same may be said of this case. Section 50(u) is unique to the Texas Constitution. Its preclusion of the injury typically required for standing requires application of the doctrine in context. The alternative, as we have noted, is to allow the doctrine to be used to alter what it is designed to maintain — the proper separation of powers.

---

[91] *Post* at ___.

To return to Justice Frankfurter's observation, the substantive issues are certainly appropriate for judicial decision — including whether judicial review of the Commissions' interpretations is permitted — and the hardship of withholding decision is significant, given the parties' unity in urging a resolution on the merits. Having raised the issue of standing at the tail end of eight years of litigation, the Court must construe the record liberally, and in the context of an exceptional constitutional provision. Doing so, we conclude that the Homeowners have standing.

**IV**

We come at last to the Homeowners' substantive challenges. We begin by determining the appropriate standard of review, then move in turn to each challenge.

**A**

"Construction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute."[92] The Commissions argue that courts must give at least this much deference to their interpretations of Section 50(u). But as the Commissions themselves assert, Section 50(u) puts their interpretations "on equal footing with those issued by courts of appeals".[93] As we have explained, we agree that this reading of Section 50(u) is correct. This Court does not defer to a court of appeals' interpretation of the Constitution but reviews it, as all matters of law, *de novo*.[94] Indeed, the courts of appeals do not even defer to each other's constitutional interpretations.

---

[92] *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993).

[93] Commissions' Brief 14.

[94] *E.g.*, *Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009).

26

By giving agency interpretations the same stature as those of appellate courts, Section 50(u) requires that courts give the one no more deference than the other.

The Commissions argue that the history of Section 50(u) shows that their interpretative authority was intended to be "definitive", but this is true only in comparison to the *Regulatory Commentary*, which was merely advisory, and issued prior to Section 50(u).[95] Nothing suggests their authority under Section 50(u) is to be more definitive than an appellate court's interpretation.

The Commissions argue that their interpretations are entitled to greater deference because Section 50(u)'s delegation of authority is unique, but it is only the delegation itself that is unique, not the interpretative authority delegated. Nothing suggests that the framers and ratifiers had anything in mind other than ordinary constitutional interpretation, assuming that a more expansive power were even possible under the Constitution. The Commissions argue that they were chosen because of their expertise in lending markets, which should be entitled to deference in any review. But the power to interpret the constitutional text is unrelated to an agency's expertise in an industry, or to its regulatory power, which is ordinarily quite broad. In interpreting Section 50, the Commissions must give effect to the constitutional text, regardless of whether it comports with their expertise or regulatory judgment. The Commissions cannot use their authority under Section 50(u) and the enabling legislation to set policy. They can do no more than interpret the constitutional text, just as a court would.

---

[95] *Stringer v. Cendant Mortg. Corp.*, 23 S.W.3d 353, 357 (Tex. 2000) (noting that the Commissions' *Regulatory Commentary* released prior to Section 50(u)'s enactment "is advisory and not authoritative").

The Commissions contend that *de novo* review of their interpretations "undermines the entire purpose of [Section 50(u)], as Texans could not rely upon the Commissions' interpretations with any confidence that they were valid, and that compliance therewith would protect the enforceablilty of their loan transactions."[96] But this is simply not true. Under Section 50(u), compliance with any interpretation or judicial decision, even one later overturned, is compliance with the Constitution itself. Review of the Commissions' interpretations may alter what lenders must do going forward, but it does not expose them to liability for past conduct.

In essence, the Commissions argue for interpretative authority that is not only unreviewable but greater than that exercised by the Judiciary. Such a grant of power cannot be found in Section 50(u). Rather, the Commissions' interpretative authority is the same as the Judiciary's, which we have described as follows:

> In construing the Constitution, as in construing statutes, the fundamental guiding rule is to give effect to the intent of the makers and adopters of the provision in question. We presume the language of the Constitution was carefully selected, and we interpret words as they are generally understood. We rely heavily on the literal text. However, we may consider such matters as the history of the legislation, the conditions and spirit of the times, the prevailing sentiments of the people, the evils intended to be remedied, and the good to be accomplished.[97]

And their interpretations are to be reviewed as judicial decisions are.

---

[96] The Commissions' Brief 19.

[97] *Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d at 842 (citations and internal quotation marks omitted).

28

**B**

Section 50(a)(6)(E) provides that a home equity borrower may not be required to pay, "in addition to any interest, fees to any person that are necessary to originate, evaluate, maintain, record, insure, or service the extension of credit that exceed, in the aggregate, three percent of the original principal amount of the extension of credit". According to the Commissions, the meaning of "interest" is "as defined in the Texas Finance Code § 301.002(4) and as interpreted by the courts."[98]

The fatal difficulty with the Commissions' interpretation is that it does not merely adopt the substance of the statute at the time the interpretation became effective; it adopts whatever definition of "interest" the Legislature may enact from time to time by amending Section 301.002(4). The Commissions acknowledge that the Legislature can change the effect of their interpretation and the meaning of Section 50(A)(6)(E) simply by amending the statute,[99] and this in fact is what has happened. When the interpretation became effective in January 2004, Section 301.002(4) stated: "In this subtitle . . . 'Interest' means compensation for the use, forbearance, or detention of money. The term does not include time price differential, regardless of how it is denominated."[100] The following year, the Legislature amended the provision to add a third sentence: "The term does not include compensation or other amounts that are determined or stated by this code or other applicable law not to constitute interest or that are permitted to be contracted for, charged, or received in addition to

---

[98] 7 TEX. ADMIN. CODE § 153.1(11).

[99] The Commissions' Brief 22. The TBA agrees. Brief on the Merits of Texas Bankers Ass'n 13.

[100] Act of April 23, 1999, 76th Leg., R.S., ch. 62, § 7.18, 1999 Tex. Gen. Laws 127, 222.

29

interest in connection with an extension of credit."[101]   In effect, the Commissions, creatures of the Legislative Department appointed by the Executive, have used their interpretative power under Section 50(u) to give the Legislature the unfettered authority to alter as it chooses the constitutional fee cap, a critical part of the protections built into Section 50.  In the Commissions' view, they are empowered not only to interpret Section 50(a)(6)(E) but, in so doing, to authorize the Legislature to redefine the provision's terms.  The Commissions' interpretation of the fee cap, tying its meaning to a statute, utterly defeats the clear purpose of constitutionalizing it, which was to place the limitation beyond the Legislature's power to change without ratification by the voters.  For this reason alone, the Commissions' interpretation is invalid.

The Commissions nevertheless insist that "interest" in Section 50(a)(6)(E) should mean "compensation for the use, forbearance, or detention of money", as defined in Section 301.002(4) at the time the constitutional provision was adopted, and as understood under Texas law since at least 1879.[102]  But that broad definition has generally been used in the context of prohibiting usury. Thus, for example, the 2005 amendment to Section 301.002(a)(4) excepts from the definition for the first time certain lender-charged fees allowed by law.[103]  The ostensible purpose of that legislation was to relax restrictions on usury, but if "interest" in Section 50(a)(6)(E) has the same meaning, the

_____

[101] Act of May 29, 2005, 79th Leg., R.S., ch. 1018, § 2.01, 2005 Tex. Gen. Laws 3438, 3439-3440.

[102] TEX. REV. CIV. STAT. ANN. art. 2972 (1879) ("'Interest' is the compensation allowed by law or fixed by the parties to a contract for the use or forbearance or detention of money."); *see also Battaglia v. Alexander*, 177 S.W.3d 893, 907 (Tex. 2005) ("'Interest' has long been defined by the Legislature as 'compensation for the use, forbearance, or detention of money.'" (citations omitted)); *Galveston & Hous. Inv. Co. v. Grymes*, 63 S.W. 860, 861 (Tex. 1901) (citing the same text in TEX. REV. CIV. STAT. ANN. art. 3097 (1895)).

[103] Act of May 29, 2005, 79th Leg., R.S., ch. 1018, § 2.01, 2005 Tex. Gen. Laws 3438, 3439-3440.

30

exception for such fees places them back under the three-percent cap. Nothing suggests that the Legislature intended the 2005 amendment to do both.

The functions of "interest" in applying the constitutional fee cap for home equity loans and in prohibiting usury are inversely related. If the word is given the same meaning in both contexts, then including lender-charged fees in "interest" strengthens usury laws and weakens the fee cap, though both are designed to protect consumers. That this was the intent of the framers and ratifiers of Section 50(a)(6)(E) is simply implausible.

The Commissions point out that Section 50(u), giving them interpretative authority, was adopted after they had already suggested in their *Regulatory Commentary* that "interest" in Section 50(a)(6)(E) should have the same meaning as in Section 301.002(a)(4) of the Finance Code, indicating that the Legislature acquiesced in that view, as confirmed by the Legislature's later refusal to enact bills that would have narrowed their interpretation. But as we have seen, the Legislature quickly amended Section 301.002(a)(4). The Legislature cannot be said to have acquiesced in anything other than the Commissions' view that it should be authorized to alter the constitutional provision by statute.

The Commissions' position is that in capping "fees to any person that are necessary to originate, evaluate, maintain, record, insure, or service" a home equity loan, the framers and ratifiers intended to cap only fees to any person *other than the lender*. But had that been their intent, surely the simplest and clearest way to express it would have been to use those four words, rather than the oblique phrase, "in addition to any interest". This is especially true because there is another, well-

31

understood meaning of "interest": the amount equal to the loan principal multiplied by the interest rate. Applied to Section 50(a)(6)(E), that definition allows "any person" to mean just that.

We conclude that consistent with the history, purpose, and text of Section 50(a)(6)(E), "interest" as used in that provision means the amount determined by multiplying the loan principal by the interest rate.[104]

## C

Section 50(a)(6)(N) provides that a loan may be "closed only at the office of the lender, an attorney at law, or a title company". The Commissions acknowledge, and the Homeowners agree, that "[t]his provision was intended to prohibit the coercive closing of an equity loan at the home of the owner."[105] Nevertheless, the Commissions' interpretations allow a borrower to mail the required signed consent to the lender[106] and to close through an attorney-in-fact.[107] Both these interpretations permit coercion in obtaining the required consent and a power of attorney at the borrower's home, allowing the final closing to occur later at one of the prescribed locations, thereby defeating the purpose of the provision.

---

[104] This narrower definition of interest does not limit the amount a lender can charge for a loan; it limits only what part of the total charge can be paid in front-end fees rather than interest paid over time. In so doing, it incentivizes lenders to determine borrowers' creditworthiness more carefully and helps borrowers better assess the costs of credit.

[105] 29 Tex. Reg. 84, 90 (2004).

[106] 7 TEX. ADMIN. CODE § 153.15(3) ("A lender may receive consent required under Section 50(a)(6)(A) by mail or other delivery of the party's signature to an authorized physical location and not the homestead.").

[107] Id. § 153.15(2) ("A lender may accept a properly executed power of attorney allowing the attorney-in-fact to execute closing documents on behalf of the owner.").

Closing a loan is a process. It would clearly be unreasonable to interpret Section 50(a)(6)(N) to allow all the loan papers to be signed at the borrower's house and then taken to the lender's office, where funding was finally authorized. Closing is not merely the final action, and in this context, to afford the intended protection, it must include the initial action. Executing the required consent or a power of attorney are part of the closing process and must occur only at one of the locations allowed by the constitutional provision.

Whether so stringent a restriction is good policy is not an issue for the Commissions or this Court to consider. That the issue should arise counsels against constitutionalizing minutiae, placing them beyond regulatory or legislative adjustment. But the purpose of the provision is indisputable, and the Commissions' interpretations in derogation of that purpose can be justified only by reading "closing" to mean some aspect of the closing process. The court of appeals concluded that the use of the mail to transmit documents and of a power of attorney to facilitate execution are so commonplace that had the framers and ratifiers of Section 50 intended to preclude these practices, they would have said so with more specificity.[108] The court pointed to Section 50(a)(6)(Q)(iv), which prohibits using a borrower's power of attorney to facilitate obtaining a judgment against a debtor, should he default. But it is precisely the common use of the mail and powers of attorney in closing transactions that gives rise to the danger of coercion Section 50(a)(6)(N) was intended to prevent.

---

[108] 303 S.W.3d at 417 (citations omitted).

We conclude that the Commissions' interpretations of Section 50(a)(6)(N) contradict the purpose and text of the provision and are therefore invalid.

**D**

Finally, Section 50(g) requires that a loan not be closed before the 12th day after the lender provides the borrower the prescribed notice.[109] In giving meaning to "provides", the Commissions have determined there is a rebuttable presumption that notice is received three days after it is mailed.[110] The Homeowners insist that a lender must establish actual receipt of notice in each case. But the Commissions' interpretation does not impair the constitutional requirement; it merely relieves a lender of proving receipt unless receipt is challenged. We agree with the court of appeals that the interpretation is but a reasonable procedure for establishing compliance with Section 50(g).

\* \* \*

The judgment of the court of appeals is affirmed in part and reversed in part, and judgment is rendered .

_____

Nathan L. Hecht
Justice

Opinion delivered: June 21, 2013

_____

[109] TEX. CONST. art. XVI, § 50(f).

[110] 7 TEX. ADMIN. CODE § 153.51(1), (3) ("(1) If a lender mails the consumer disclosure to the owner, the lender shall allow a reasonable period of time for delivery. A period of three calendar days, not including Sundays and federal legal public holidays, constitutes a rebuttable presumption for sufficient mailing and delivery. . . . (3) A lender may rely on an established system of verifiable procedures to evidence compliance with this section.").